Ben Jaffe and Elsie Jaffe v. Commissioner.
Jaffe v. Commissioner
Docket Nos. 93284, 3645-64.
United States Tax Court
T.C. Memo 1967-223; 1967 Tax Ct. Memo LEXIS 37; 26 T.C.M. (CCH) 1110; T.C.M. (RIA) 67223; November 8, 1967
*37 Guarantee Reserve, an insurance company, had 50,000 shares of issued stock of which 37,500 shares were owned by Jaffe and his family, and 12,500 shares were owned by Kutak and his family. Jaffe was president and a director of Guarantee until August 10, 1956, when he resigned, and Kutak became president and a director. Prior to 1957, Jaffe borrowed large sums to finance the building of Tropicana Hotel in Nevada through Bond, a wholly owned corporation. Early in 1957, Jaffe's immediate indebtedness to banks and for taxes was $1,170,000. Guarantee had made large loans to Bond and was under criticism of the Indiana Insurance Department. Jaffe was without funds and assets to pay immediate debts. He entered into a transaction on June 5, 1957, with X, whereby he sold X 4,167 shares of Guarantee stock at $300 per share, and X was given a 7-month option to purchase all of the balance of the shares of Guarantee owned by the Jaffe Family Voting Trust at $300 per share. X borrowed $1,250,000 to make the purchase, which amount Jaffe used to pay his debts. X obtained the stock option purportedly to sell the stock through the underwriting of a public offering. But X wanted a "vehicle" that would *38 enable him to dispose of the 4,167 shares if he could not arrange for selling the 33,333 shares of the Jaffe family's stock, so that he could repay the funds borrowed by X and also realize a gain of $30 per share. Kutak agreed to purchase the 4,167 shares from X at $330 per share, or $1,375,110, in the event that X was unable to sell all of the option stock by January 16, 1958, at $330 per share. X discussed with several securities dealers and others the proposed underwriting and sale of about 33,000 shares of Guarantee stock, but the underwriting and sales were not arranged, and X concluded in December 1957 that the underwriting could not be assured by the time of the expiration of his option on January 15, 1958. In January 1958, X advised Kutak of the above and asked whether Guarantee would buy from X the 4,167 shares at $330 per share. On January 15, 1958, Guarantee paid $1,375,110 to X for his shares, and eventually cancelled those shares. X repaid his debt to a bank with the proceeds. In his tax return, X reported long-term capital gain of $125,010, and deducted $38,356.16 for interest paid. Jaffe reported long-term capital gain in his 1957 return from the sale of shares *39 to X in the amount of $1,237,457.33; the basis of the 4,167 shares is $12,542.67. Held: Guarantee's redemption in 1958 of 4,167 shares of its stock and payment of $1,375,110 therefor to X constituted a distribution of a dividend to Jaffe in 1958 in the above amount. Benjamin M. Brodsky, *40 Claude A. Roth, and Elliot I. Goodman, 111 W. Jackson Blvd., Chicago, Ill., for the petitioners. Charles B. Wolfe, Jr., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income taxes for 1957 and 1958, and 5 percent additions to the tax for negligence under section 6653(a), 1954 Code, as follows: Year
Deficiency
Sec. 6653(a)
1957
$1,000,203.11
$50,010.16
1958
1,293,421.57
64,671.08
Several of the determinations of the respondent for each year have been settled by the parties under stipulations, and the respondent has conceded that in the event that it is held that there was an underpayment of tax for 1958, the addition to tax, provided for in section 6653(a), shall not apply. The petitioners concede that if it is held that there was underpayment of tax for 1957, the addition to tax under section 6653(a) shall apply. Effect will be given to all of the stipulations and concessions for 1957 and 1958 under Rule 50. For each of the years 1957 and 1958, only one issue for each year is presented for decision. However, the major determination of respondent for each taxable *41 year involves an alternative determination. Under the one general issue, the questions for decision are as follows: (1) Whether the petitioner, Ben Jaffe, realized ordinary income in 1957, as the result of his transaction involving 4,167 shares of stock of Guarantee Reserve Life Insurance Company, representing a dividend of Guarantee, in the amount of $1,250,100, and dividend income in 1958 in the amount of $125,010. (2) In the alternative, whether Jaffe realized income in 1958 in the amount of $1,375,110 as the result of Guarantee's payment of that sum to Clarence A. Beutel. Findings of Fact The stipulated facts are found as stipulated. The stipulations of facts are incorporated herein by reference. Petitioners, residents of Flossmoor, Illinois, timely filed joint returns foor the calendar years 1957 and 1958 with the district director of internal revenue in Chicago. Ben Jaffe is referred to herein as the petitioner because the issues relate to him. Petitioner kept his books and reported income at all times material on the basis of a calendar year and used a cash method of accounting. The original Guarantee Reserve Life Insurance Company was organized in 1933 under the laws *42 of Indiana and had its offices in Indianapolis, Indiana. It was an Indiana mutual assessment corporation. Petitioner acquired the controlling interest in this corporation in 1940. On February 6, 1945, petitioner organized a new Indiana stock company (as distinguished from a mutual assessment company) as a legal reserve life insurance company engaged in the business of writing and underwriting life insurance and health and accident insurance. The name of that company was "Guarantee Reserve Life Insurance Company of Hammond". In 1945, the two companies were moved to Hammond, Indiana, and the new company reinsured the business of the old company. The old company remained in existence until about 1947. Recently, the words "of Hammond" were dropped from the name of the 1945 corporation, so that it is now known as "Guarantee Reserve Life Insurance Company." It is hereinafter sometimes called Guarantee. At the times relevant, Guarantee wrote life, health and accident, hospitalization, and various types of personal insurance. During the years 1954 to 1957, inclusive, about 80 percent of the total insurance written by Guarantee was disability insurance (which included health and accident *43 and hospitalization), and about 20 percent was life insurance. During 1956 and 1957, Guarantee was primarily a mail order business. Since the inception of Guarantee, its total issues and outstanding capital stock was owned 75 percent by petitioner and members of his family, and 25 percent by Jerome F. Kutak (Kutak) and members of his family. On November 23, 1945, both Guarantee and Guarantee Reserve Life Insurance Company employed Kutak as the general manager of each company for a term of 10 years. On about November 23, 1945, petitioner loaned Kutak the sum of $37,500 and received Kutak's note bearing 5 percent interest. Kutak purchased 2,500 shares of the capital stock of Guarantee, his original investment, with the proceeds of the loan. This constituted 25 percent of the total issued and outstanding shares of capital stock of Guarantee. But Kutak paid nothing on the loan principal until November 1961, when he paid Jaffe $35,000. In June 1957, as a result of intervening stock dividends, of which Kutak's share was 10,000 shares, the total issued and outstanding shares of capital stock of Guarantee consisted of 50,000 shares of common stock of the par value of $10 per share, which *44 represented an increase from 10,000 to 50,000 shares. Of the 50,000 shares, 37,500 shares were owned directly or through a voting trust by petitioner and members of his family, and 12,500 shares were owned directly or through a voting trust by Kutak and members of his family. The Jaffe and Kutak families have never been related to each other either by blood or marriage. With respect to petitioner's loan to Kutak in 1945, Kutak made a payment of $35,000 on principal on November 1, 1961, and there is still a balance due on principal of $2,500. Kutak paid interest on the note, $26,378.48 on December 15, 1959, and $3,500.02 on November 1, 1961. Petitioner was president of Guarantee and a member of its board of directors from the time that it was organized in 1945 until August 10, 1956, when he resigned from both positions; and he has not been an officer or director since then. Kutak was elected president to succeed Jaffee, and he has been the president of Guarantee ever since then. Kutak has been a member of the board of directors of Guarantee since 1945. Kutak had been secretary and vice president of the old Guarantee Reserve Life Insurance Company, and has been general counsel, secretary, *45 and vice president of Guarantee. During 1957, Kutak was the managing head of Guarantee. On June 5, 1957, prior to the transaction here involved, the stock of Guarantee was owned as follows: Jaffe family
No. of Shares
Ben Jaffe and Eugene Jaffe,
Trustees under Jaffe Family
Voting Trust Agreement dated
November 15, 1952, as amended
29,633 1/3
Ben Jaffe
5,566 2/3
Elsie Jaffe
666 2/3
Eugene Jaffe
666 2/3
Evelyn Jaffe
666 2/3
Robert E. Weiss
100
Richard Seidel
100
Richard Slott
100
Total Jaffe Family
37,500
Kutak family
Jerome F. Kutak and Robert J.
Kutak, Trustees under Kutak
Family Voting Trust Agree-
ment dated October 15, 1960,
as amended
12,400
Jerome F. Kutak
100
Total Kutak Family
12,500
Total issued and outstanding shares
50,000
On June 5, 1957, prior to the transaction here involved, the shares of beneficial interest in the Jaffe Family Voting Trust Agreement dated November 15, 1952, as amended, were owned as follows: Shares of
Owner
Beneficial Interest
Ben Jaffe
5,653 1/3
Elsie Jaffe
5,333 1/3
Eugene Jaffe
5,213 1/3
Betty Jaffe Weiss
5,505
Judith Jaffe Seidel
5,505
Evelyn Jaffe
938 1/3
Eugene Jaffe, Judith Seidel and
Betty Jaffe Weiss, as Trustees
for Jan E. Seidel, Karen N.
Seidel and Laurie B. Seidel
315
Eugene Jaffe and Betty Jaffe
Weiss, as Trustees for Ben S.
Jaffe, Jean Anna Jaffe, Lynn
Susan Jaffe, Kathy D. Weiss,
Julie B. Weiss, Ellen S. Weiss
960
Richard Seidel
105
Robert A. Weiss
105
29,633 1/3
*46 Kutak and his 4 children own directly or beneficially through the Kutak Family Voting Trust the following shares of Guarantee: Jerome F. Kutak
100
Jerome F. Kutak
6,300
Carolyn M. Kutak
1,525
Robert J. Kutak
1,525
Anne Elizabeth Kutak
1,525
Mary Louise Kutak
1,525
12,500
The Jaffe family consists of Ben Jaffe and the following individuals whose relationship to Ben Jaffe are as follows: Elsie Jaffe, Jaffe's wife; Eugene Jaffe, son; Judith Jaffe Seidel, daughter; Betty Jaffe Weiss, daughter; Evelyn Jaffe, Eugene Jaffe's wife; Robert E. Weiss, Jaffe's son-in-law; and Richard Seidel, Jaffe's son-in-law. The Kutak family consists of Jerome Kutak and the following individuals whose relationship to him are as follows: Carolyn M. Kutak, daughter; Robert J. Kutak, son; Anne Elizabeth Kutak, daughter; and Mary Louise Kutak, daughter. Richard Slott, who is not related to the Jaffe family, nominally held 100 shares of stock of Guarantee in order to qualify as a director. The Jaffe Family Voting Trust Agreement, dated November 15, 1952, as amended, is incorporated herein by reference. This agreement provided in Articles IV and IX, inter alia, as follows: *47 ARTICLE IV Section 1. The Voting Trust created by this agreement shall be administered by the Voting Trustees hereinafter provided for who shall have and be vested with such rights, powers, privileges and authorities, and such duties and obligations, as are given to, vested in or imposed upon them by the terms and provisions of this agreement. * * *
Section 8. Subject to the proviso hereinafter in this Section 8 contained, the Voting Trustees shall have full power and authority to vote either in person or by proxy, any shares of stock constituting a part of the Voting Trust Assets in the election of directors and upon any other matter, proposition or thing whatsoever, at all meetings of the stockholders, whether regular or special, and to give consents or approval with respect thereto, to the same extent as they would have if they were the absolute owners of such stock; provided, however, that before any action is taken by the Voting Trustees in respect of (i) the selling, pledging or mortgaging all or substantially all of the Voting Trust Assets, either to secure the debt of the Voting Trustees as such trustees, or to secure a debt of the corporation (which right and power *48 to pledge or hypothecate the voting trust assets to secure a debt of the corporation is hereby expressly conferred upon the trustees, subject to the percentage consent requirement herein contained) or (ii) the merger or consolidation of said Company with any corporation other than a subsidiary of said Company, or (iii) the issuance of shares of stock senior to the shares of common stock of said Company, or (iv) waiver of the preemptive rights of the stockholders of said Company, the consent in writing of the holders and owners of Voting Trust Certificates evidencing beneficial interest in not less than fifty-one percent (51%) of the shares of the capital stock of said Company at the time constituting a part of the Voting Trust Assets shall be first obtained. * * *
ARTICLE IX * * *
Section 2. (a) The Voting Trustees shall be Ben Jaffe and Eugene Jaffe. In the event of any dispute between Ben Jaffe and Eugene Jaffe the decision of Ben Jaffe shall prevail. * * *
The officers and directors of Guarantee for 1957 were as follows: Jerome F. Kutak
President and Director
R. D. Slott
Vice-President and Director
F. X. Moose
Secretary-Treasurer
Jack G. Boyd
Assistant Secretary
R. Seidel
Director
Eugene Jaffe
Director
R. Weiss
Director
*49 The officers and directors of Guarantee for 1958 were as follows: Jerome F. Kutak
President and Director
Eugene Jaffe
Vice-President and Director
R. D. Slott
Vice-President
R. Weiss
Treasurer and Director
R. Seidel
Secretary and Director
Jack G. Boyd
Assistant Secretary
F. X. Moose
Comptroller
C. Strezo
Assistant to President
R. J. Kutak
Director
Guarantee made loans to a few ventures in which Jaffe had an interest. One of these was a loan to Bond Estate, Inc., (Bond) a corporation which built the Tropicana Hotel in Las Vegas, Nevada. The others consisted of a mortgage on Florida property, and a loan on a Lake Tahoe project. During 1956, these loans were criticized by the Indiana Department of Insurance. While the loan to Bond was not criticized as illegal, the Department was disturbed and felt that it was too large a loan for a company the size of Guarantee to make to one borrower. The loan from Guarantee to Bond went to a high of $4,500,000. The Department also was disturbed because Bond was in an area of operation of which the Insurance Commissioner disapproved, as a matter of public policy. The Department was also concerned about the fact that *50 petitioner, the president of Guarantee, was operating in Las Vegas and Florida. Kutak talked to petitioner's counsel, and to Clarence A. Beutel, a banker who was quite familiar with Guarantee's affairs, about persuading Jaffe to resign as president and a director for the good of Guarantee. Petitioner resigned because, in the light of unfavorable publicity at the time, he thought it would be in the best interests of Guarantee if he did so, and thereby relieve the pressure that the Indiana Insurance Department was exerting upon Guarantee. Petitioner's resignation was real and actual, and was not simply a matter of form. Upon that resignation and Kutak's election as president of Guarantee, Kutak went before the Insurance Department and advised it that he was the new president; that the past course of conduct in connection with loans would not be followed; and that he would assume full responsibility, as president, for the company's policies in the future. The Insurance Commissioner accepted this assurance. Upon petitioner's resignation in 1956, his wife, Elsie, also resigned as a director; and his son, Eugene, resigned as an officer. Petitioner's son-in-law, Richard Seidel, replaced *51 petitioner on Guarantee's Board of Directors, and Richard Slott (who was not a member of the Jaffe family) replaced Elsie on the Board. Slott also was elected executive vice president. The Transaction In Issue In the early part of 1957, as has been stated above, there were 50,000 shares of stock outstanding of Guarantee Reserve Life Insurance Company, of which 37,500 shares were owned by the Jaffe family, and 12,500 shares were owned by the Kutak family. Of the Jaffe family's 37,500 shares, Ben Jaffe (the petitioner) owned, individually, 5,566 2/3rds shares. Under circumstances set forth hereinafter, Ben Jaffe entered into a transaction on June 5, 1957, with Clarence A. Beutel, the president of The South East National Bank of Chicago, whereby Jaffe, individually, purportedly sold to Beutel 4,167 shares of the stock of Guarantee Reserve Life Insurance Company (out of his 5,566 2/3rds shares) for the sum of $1,250,100, at the price of $300 per share. On the same date, June 5, 1957, (the date of the closing of the transaction after the completion of the preparatory arrangements), the members of the Jaffe family, who owned the voting trust certificates of the Jaffe Family Voting Trust, *52 which held 33,333 shares of stock of Guarantee, directed the voting trustees to grant to Beutel an option to purchase the 33,333 shares of stock of Guarantee at the price of $300 per share at any time prior to the close of business on January 15, 1958; and also to give Beutel an irrevocable proxy, expiring January 16, 1958, to vote all of the shares of stock covered by the option. Ben Jaffe entered into this transaction with Beutel because in the spring of 1957, Ben Jaffe was heavily in debt and had to obtain money to apply to his total indebtedness to banks and for federal income taxes (for 1956) in the total amount of at least $1,170,000, plus interest, as follows: Owed to City National Bank, Chicago
$ 580,000
Owed to First National Bank, Chicago
400,000
Owed federal income tax, 1956
190,000
$1,170,000
There was outstanding on May 1, 1957, a note of Jaffe payable to City National Bank and Trust Company of Chicago (City National Bank) in the amount of $580,000 which was to become due on May 31, 1957, after previous renewals and extensions of time for payment. All of the shares of stock of Guarantee owned by Jaffe and the Jaffe family, 37,500 shares, and *53 all of the shares owned by the Kutak family, 12,500 shares, had been pledged as collateral and were held by City National Bank to secure its original loan to Jaffe which had been made by City National Bank in 1955 in the amount of $1,500,000. Kutak had signed the original note, given for the original loan of $1,500,000, as an accommodation party, only, the borrowing having been that of Ben Jaffe, and the City National Bank having made the loan to Jaffe. That loan had been reduced by payments to $580,000 as of May 1, 1957. Beutel, in order to make the purported and alleged purchase on June 5, 1957, from Jaffe of Jaffe's 4,167 shares of stock of Guarantee for $1,250,100 made arrangements with City National Bank to borrow $1,250,000, which City National Bank agreed to do. Beutel's alleged purchase of Jaffe's shares of stock and the granting to him of an option to purchase the additional 33,333 shares of the Jaffe family's shares of stock of Guarantee was not the end of Beutel's arrangements. Beutel purportedly undertook to arrange for a public offering (future sale to the public) of 37,500 shares of the stock of Guarantee. Facts relating to those efforts are set forth hereinafter. *54 On June 5, 1957, Beutel delivered to Ben Jaffe his check for $1,250,100, dated June 6, 1957, drawn on Beutel's bank account in The South East National Bank of Chicago, in payment for Jaffe's 4,167 shares of stock of Guarantee (at $300 per share). With this sum of $1,250,100, Jaffe paid the balance he owed to City National Bank, $580,000, plus interest; he paid to First National Bank his indebtedness to that bank which was in excess of $400,000, plus interest; and he paid the $190,000 that he owed on his federal income tax for 1956. Under circumstances hereinafter set forth, Beutel was unable to arrange for a public offering of the shares of stock of Guarantee in which he had an interest; and in the latter part of December 1957, Beutel concluded that the possibility of a successful underwriting of the block of stock of Guarantee was very remote. Under circumstances set forth hereinafter, Guarantee, on January 15, 1958, purchased from Beutel the 4,167 shares of stock of Guarantee, held by Beutel, at the price of $330 per share, for $1,375,110, and issued its check for that amount to Beutel. Beutel applied that sum to the payment of his indebtedness to City National Bank in respect *55 of the loan to him by City National Bank in June 1957 in the principal amount of $1,250,000, plus interest. The petitioner's position is that in 1957 he realized a long-term capital gain in the amount of $1,237,557.33 upon the sale of his 4,167 shares of stock of Guarantee to Beutel. The gain is the difference between the sale price of $1,250,100.00 and the agreed basis of the shares, $12,542.67. In their joint return for 1957, the petitioners reported the transaction of Jaffe with Beutel in that way (except that an error of $100 was made in the gross sales price reported as $1,250,000.00, which error petitioners have recognized); i.e., as a long-term capital gain. The respondent's position is, briefly, that when Guarantee in 1958 redeemed 4,167 shares of its stock (in a purported transaction in 1958 with Beutel in which Guarantee paid Beutel $1,375,110, or $330 per share), Ben Jaffe received dividends from Guarantee in the amounts of $1,259,100 in 1957, and $125,010 in 1958 (a total of $1,375,110); or, in the alternative, that Jaffe constructively received a dividend from Guarantee in 1958 in the amount of $1,375,110. The Economic Position of Jaffe, 1955-1957 At some time *56 prior to 1955, Ben Jaffe made investments in hotel real estate ventures in Florida and Las Vegas, Nevada. For example, he owned stock and debentures of the Flamingo Hotel Corporation which owned the Flamingo Hotel in Las Vegas, Nevada. Also, in 1956 and before, Jaffe owned 35 or 40 percent of the stock of the corporation that owned the Fontainebleau Hotel in Miami Beach, Florida. In 1954 or 1955, and thereafter, Jaffe owned all of the shares of stock of Bond Estate, Inc. Bond, beginning in 1955, constructed and owned the Tropicana Hotel and the land, in Las Vegas, Nevada. The construction, completion, leasing, and collecting rents from the lessee of the Tropicana Hotel developed and involved greatly larger costs than were estimated originally, and serious financial problems resulted therefrom to both Bond Estate, Inc. and Jaffe. There were delays in collecting rents from the leasee of the hotel; those delays caused Jaffe a great deal of financial difficulty in paying his loans to banks. The problems of Bond Estate, Inc. in constructing, completing, and leasing the Tropicana Hotel, and in financing the construction thereof, were in general as follows: In 1954, Bond Estate bought the *57 land, for $429,000, where the Tropicana was to be built. As of June 30, 1957, Jaffe had invested $2,000,000 in the capital stock of Bond. The original estimate in 1954 of the cost of the Tropicana Hotel was $5,000,000. It was originally planned that Bond would borrow funds in connection with building and furnishing the hotel. While Jaffe was the president of Guarantee Reserve Life Insurance Company, he recommended in 1954 that Guarantee loan funds to Bond. Guarantee was authorized to make a loan to Bond; the original commitment of Guarantee was made in 1954 (while Jaffe was president), and was to loan Bond up to $1,300,000, secured by a mortgage, at interest rates which ran up to 8 percent. The actual cost of the Tropicana Hotel and the furnishings amounted to more than $10,000,000. Eventually, Jaffe advanced to Bond, personally, $3,000,000, for which he received Bond's debentures; and Guarantee's loans to Bond rose to $4,500,000. As has been noted above, Jaffe borrowed $1,500,000 in 1955 from City National Bank. As part of the collateral for that loan to Jaffe, an unrecorded first mortgage on the Tropicana Hotel was given to City National, with a commitment on the part of Guarantee *58 to purchase the mortgage, which commitment ran up to April 1, 1956. The commitment expired on April 1, 1956; it was not renewed; and Guarantee did not have to take up the mortgage. Jaffe borrowed the $1,500,000 from City National Bank in 1955 in connection with the Tropicana Hotel construction. The Tropicana Hotel was completed, furnished, and tendered to the lessee, the Conquistador Corporation, in August 1956, a letter from the Nevada Hotel Commission stated that the hotel was finished and ready for occupancy. However, Conquistador did not take occupancy in August 1956. Bond Estate leased the hotel to Conquistador, which is an unrelated corporation. Conquistador was to operate the hotel and all of its facilities, including a casino, but it was necessary for Conquistador to obtain a gambling license from the Nevada Gaming Commission. Under the lease, Conquistador was to pay Bond Estate a monthly rental of $100,000. Jaffe and Bond Estate expected Conquistador to take possession of the hotel and begin paying the monthly rent as of August 1, 1956. Due to its delay in obtaining its gambling license for operating the Casino, Conquistador not only did not begin paying rent in August *59 1956, but it stalled off the taking of occupancy on the basis of complaints that many of the details in the finishing and furnishing of the hotel and hotel facilities were not completed or were unsatisfactory. Bond's compliance with the lessee's demands further added to costs and eventually there was a renegotiation of the lease. The hotel was fully furnished and entirely ready for occupancy, equipped with all of the furnishings from silver to soap, and the beds even were made up. Jaffe consulted his lawyers; they advised him that the lease had been breached, and they suggested that Jaffe take over the operation of the hotel. But Jaffe did not know enough about the operation of a casino to warrant his making the required deposit of $500,000 with the Nevada Gaming Commission, which was a condition for obtaining the gambling license; and therefore he did not want to operate the hotel. Jaffe tried unsuccessfully to get other hotel operators to lease or sublease the hotel. Meanwhile, in 1956, mechanics liens on the hotel were filed by various contractors who had furnished materials and labor in the construction of the hotel. As of August 1, 1956, these liens and claims amounted to $837,240.66. *60 Jaffe had expected that rental payments by Conquistador would begin on August 1, 1956, and its failure to begin rental payments constituted a serious problem. In addition, about $1,000,000 was owing on a conditional sale contract covering Bond's purchase of hotel furniture from Albert Parvin Company. Parvin Company had sold the contract (discounted it) to the Bank of America, and Parvin Company and then the Bank of America, respectively, held either a lien on the furniture, or held the title thereto pending payment. Of the $1,000,000 owing on this contract, a payment of $426,517.63 was due within the 12-month period beginning July 1, 1957. The delay of Conquistador in taking occupancy of the hotel and in paying rent continued through November 1956, and during this period those holding liens were pressing for payments on the large sums owed to them. In addition to the above indebtedness of Bond Estates, Inc., Bond owed Guarantee Insurance Company in about August 1956, on Guarantee's loans to Bond, a balance of $2,800,000 with 8 percent interest. The interest alone amounted to $230,000 a year. And the amortization of the $1,000,000 owed to the Bank of America was $35,000 per month. *61 A meeting with the contractors who had liens for their claims against Bond was arranged by Bond's lawyers, and an agreement was reached for an amortization program. The lien holders agreed upon a schedule of payments of their claims, plus interest and lawyers' fees, to be made over a period of 18 to 24 months, during which period they agreed not to foreclose on their liens; but the liens were not to be released until all sums owing had been paid in full under this agreement, $40,000 per month was to be paid in amortization of the claims. Bond and Conquistador finally agreed that December 1, 1956, would be deemed to be the lessee's date of occupancy, but the lessee was not able to pay the rent of $100,000 a month for December and for January 1957, and Bond was obliged to agree that this sum of $200,000 could be spread over the 10-year term of the lease, and would be paid at the rate of $20,000 a year, in 2 semi-annual installments per year. The lessee did not open the Tropicana Hotel for business until April 7, 1957. Even then, the lessee was not able to pay all of the rent for April, and on April 5, it tendered only $40,000 of the $100,000 due. It then became necessary for Bond *62 to agree with the lessee that additional time would be allowed for the payment of the balance of $60,000, which amount was paid before the end of April. In April 1957, the president of the Conquistador Corporation, Theodore Schimberg, admitted to Jaffe and Jaffe's accountant, Milton Schachtman, that Conquistador had been able to sell only 87 percent of its required capitalization, that it was undercapitalized, and was extremely short of cash after paying a deposit of $500,000 with the Nevada Gaming Commission, $1,000,000 as a security deposit under the lease, and substantial amounts for foodstuffs and liquors. In June 1957, the lessee asked Bond to reduce the rent. Jaffe replied that this was impossible because the commitments of Bond were equivalent to $100,000 per month and a rent reduction would render Bond unable to pay its bills. After considerable controversy, Jaffe concluded, late in 1957 or early in 1958, that there was real danger of the lessee's defaulting entirely and abandoning the lease. Rather than lose the tenant, Jaffe agreed to reduce the rent from $100,000 per month to $65,000 per month for a period of 6 months, upon the understanding that the difference of $210,000 *63 would be evidenced by a note of the lessee. In 1959, the lessee asked Bond to erect an addition to the hotel. Jaffe advised the lessee that funds were not available for that purpose, but that if the lessee would prepay the note, it might be done. The lessee agreed, but only upon condition that interest on the note would be waived, which Bond did. Despite the cost of the hotel, Conquistador had an option to purchase the hotel for $7,500,000, exercisable at any time between the sixth and seventh years of the lease, or in about 1964. This option, which was for an amount less than the actual cost of the property, had been given when construction began and at a time when it was supposed that the hotel would cost considerably less that it finally did. Jaffe had been compelled to borrow heavily for the Tropicana venture, and he had used up all of his funds in the construction of the hotel. During the early part of 1957, his pressing obligations were to the City National Bank and Trust Company of Chicago, and to the First National Bank of Chicago. He owed City National Bank the sum of $580,000 plus interest, as the remaining balance of the original note for $1,500,000. All of the Guarantee *64 stock owned by the Jaffe family, 37,500 shares, and all of the Kutak Guarantee stock, 12,500 shares, were held as collateral for that note. By December 28, 1956, the loan had been paid down to $820,000 by monthly payments of $60,000 on the principal, plus interest. On December 28, 1956, a note was given to the bank for the $820,000 balance. That note was due May 1, 1957. That note was paid down to a balance of $580,000 by May 1, 1957, at which time petitioner asked for additional time for payment. This was granted, and another note was executed for $580,000, dated May 1, 1957, and due on May 31, 1957. Petitioner also owed the First National Bank a balance in excess of $400,000, plus interest, on a note which was due in the spring of 1957. The collateral for the loan at the First National Bank, which was made in 1956, was about 35 percent to 40 percent of the stock of the corporation which owned the Fontainebleau Hotel in Miami Beach. Petitioner had sold that stock in 1956 to Arnold Kirkeby and the buyer owed him a balance of $1,400,000 on the sales price (evidenced by a note of the buyer), for which petitioner held the stock as collateral. Petitioner gave that stock to First National *65 Bank as collateral on his loan, the arrangement being that when the buyer paid the balance of the sales price, petitioner's note would be paid out of those funds and the stock then would be delivered to the buyer. When petitioner sold the Fontainebleau stock, he gave Kirkeby's note to Bond, which in turn gave it to Guarantee to apply against Bond's indebtedness to Guarantee. When Kirkeby paid his note, the payment was therefore made to Guarantee as owner of the Kirkeby note. In addition, petitioner owed $190,000 of income tax for 1956. Petitioner had no funds in 1957 with which to pay his debts. He owned stock and debentures of Flamingo Hotel Corp. (which owned the Flamingo Hotel in Las Vegas, Nevada), which he tried unsuccessfully to sell. He finally sold those securities on September 24, 1957, for cash. The buyers borrowed the money with which to pay for the securities, but in order to make the sale possible, petitioner had to agree to pay the interest on the buyers' loan, and he in fact did pay that interest. The securities were sold for their cost, namely $585,000. Persons other than petitioner also had an ownership interest in the securities, and after paying them their shares *66 of the proceeds, petitioner was left with from $260,000 to $280,000, which he also used to pay off debts. Petitioner was afraid of being "washed out", i.e. of losing everything he had. He was particularly concerned about his note at City National because all of the Guarantee stock that was owned by the Jaffe family was held by the bank as collateral on that note. He was concerned that if the note was not paid, the bank would foreclose on that stock, and could either sell it to an outsider or bid it in for less than its real value. The note at City National had already been renewed or extended, and petitioner was concerned that because of his financial situation and because of certain unfavorable newspaper publicity concerning Guarantee and concerning petitioner's being in business in Las Vegas, the bank would not extend the note again. His concern had some foundation; he subsequently learned that the national bank examiners were pressing City National to have the note paid. Included in the collateral for the note given by petitioner to City National were a commitment by Guarantee to purchase a $1,500,000 unrecorded first mortgage on the Tropicana Hotel, and a note of Bond Estate *67 in the amount of $1,300,000. The commitment by Guarantee to purchase the aforesaid mortgage had expired on April 1, 1956. In addition, in the spring of 1957, and in the period that is material to these proceedings, Bond Estate was not in a financial position to pay to petitioner or to petitioner's bank creditors the sum of $580,000, either out of its current assets or through any refinancing or additional borrowing. It was too heavily in debt. Petitioner might conceivably have been able to borrow money with which to pay off some of his obligations, but he would not have improved his position because he had no way of paying off the new loans. He could not have sold the Tropicana at the time. It was a costly piece of property; it was not an established venture, it did not open for business until April 1, 1957, although it had been completed by November 1956; and the lessee was shaky. The only way that petitioner could meet his obligations was to sell something. Jaffe's Sale of 4,167 Shares of Stock of Guarantee The only assets which Jaffe could consider selling that would provide the needed funds to pay his pressing obligations in the spring of 1957, which amounted to $1,170,000, *68 principal amount, exclusive of interest, was his stock in Guarantee Insurance Company. He consulted his attorneys about the contemplated sale of stock in Guarantee. He considered offering some of his shares to Guarantee. His attorneys considered that proposal and advised him as follows: There could be a question whether Guarantee's purchase of some of the Jaffe shares would be regarded as a distribution to him of a taxable dividend unless there was a business purpose for the corporation in buying some of his shares. Such business purpose to the corporation could exist if City National Bank resorted to making sales of the collateral pledged there to secure Jaffe's note for $580,000 upon default in the payment thereof upon the due date on May 31, 1957. The pledged collateral consisted of all of the outstanding shares of stock of Guarantee, namely, 37,500 shares owned by the Jaffe family, and 12,500 shares owned by the Kutak family. If City National should sell to outsiders, as it would be obliged to do, a change in the management of the Guarantee Insurance Company probably would result. Jaffe's lawyers reasoned that such change in management might adversely affect the continued gainful *69 operation of the insurance business, and that the avoidance of such possibility would constitute a business reason to Guarantee to purchase from Jaffe some of his shares of stock in Guarantee. Jaffe decided early in 1957 to attempt to sell some shares of Guarantee stock to others rather than to offer it to Guarantee. However, he did make the decision to sell some of his Guarantee stock in order to raise the needed funds. Beginning in January 1957, Jaffe began to discuss with many persons his need for funds and desire to sell stock in Guarantee; he spoke to anyone who would listen; he spoke to Max Maling of Maling Brothers Shoe Store, to Eugene Given of Given Manufacturing Company, which made sports trousers, and to various members of a Club to which he belonged. Jaffe also considered offering shares for sale to the public through a broker in a "public offering" of Guarantee stock, but because of his lack of knowledge and experience in public offerings of securities he did not proceed with that possibility. In about March 1957, Clarence A. Beutel, the president of the South East National Bank of Chicago, learned that it might be possible to acquire some shares of stock of Guarantee. *70 Beutel heard of this possibility from two customers of South East, Sol Plast and Gerald Magner. Beutel phoned Kutak and asked him to inquire of Jaffe about the rumor. Kutak asked Jaffe whether Jaffe was interested in selling some of the Jaffe shares of Guarantee stock. Jaffe replied in the affirmative; Jaffe explained that he was in need of funds; Jaffe asked Kutak to phone Beutel and confirm the rumor to the effect that he (Jaffe) wanted to sell some shares of Guarantee stock. Within a few days, Kutak contacted Beutel, and Beutel then phoned Jaffe and an appointment was made for them to meet. Clarence A. Beutel: Beutel, a resident of Chicago, is president of the South East National Bank of Chicago, and has been, since its organization in 1934. South East, located in Chicago, ranked in size among the top 10 of the neighborhood banks in the Chicago area. Its approximate resources were $65,000,000, and its deposits were in excess of $60,000,000. Beutel was also chairman of the Advisory Committee of the Midwest Bank and Trust Company of Elmwood Park, Illinois, and chairman of the Advisory Committee of the Colonial Bank and Trust Company of Chicago, both in the Chicago area. For *71 a period of 10 months during 1953-1954, he was Deputy Administrator of the Reconstruction Finance Corporation in Washington, until he resigned in May 1954. He had been in the banking business for 55 years. As president of South East, Beutel supervised the investment of the excess funds of the Bank, and was the initiating party in making recommendations with respect thereto. Dur-1957 and 1958, the securities purchases made with such funds aggregated $13,789,000 and $19,400,000, respectively. He did not manage or make managerial decisions with respect to investments for clients, but he counseled them with respect to investments, and he made securities analyses for them. Beutel had never bought any insurance company stock for his own account. His annual income from about 1950 through 1957 consisted of his $35,000 annual salary from South East, and about $8,000 of dividends on his South East stock. The net worth of Beutel and his wife, including the cash value of life insurance, his investment in a cooperative apartment, and his ownership of about 5,000 shares of South East stock and Colonial Bank stock, totalled a minimum of $500,000. He owed Carmen Brown about $12,000, and he helped *72 finance a home for his niece, which involved a mortgage of about $18,000. He had conducted no buying and selling activity in stocks and bonds for his own account in 1957. Apart from his bank stock, Beutel did not own during 1957 any stock in a closely-held corporation. Beutel never was a director of any corporation other than the bank and the Woodlawn Hospital, a non-profit organization, of which he was also president. Beutel was not related by blood or marriage to the Jaffes or to any member of their family; he was never a member of the board of directors of Guarantee. The only overlapping relationship between South East and Guarantee was that of Kutak, who was a director of South East and an officer and director of Guarantee. Beutel has known petitioner since shortly before 1950, but has had little social contact with him. Beutel met Kutak in about 1950; their relationship has been both business and social. Kutak is, and since 1954 has been, a director and stockholder of South East. Beutel was instrumental in having Kutak elected to the board of directors of South East because it was good business policy to do so in connection with a good depositor. The initial relationship *73 between Guarantee and South East was established by the opening of a complimentary or inactive account by Guarantee at the bank in 1950. The relationship developed into an active one; Guarantee became a substantial depositor in the bank and used it as its main banking connection. The following is a summary in rounded figures of the monthly deposit balances of Guarantee at South East for the years 1955 to 1958, inclusive: 1955
1956
1957
1958
Jan.
$ 235,000
$1,304,148
$ 461,206
$1,414,194
Feb.
235,000
376,867
211,206
40,640
Mar.
278,000
124,462
256,857
42,190
Apr.
992,000
11,716
256,857
1,003,734
May
992,000
1,716
679,066
1,474,205
June
479,000
1,716
1,680,672
1,738,404 $6July
479,000
1,716
1,682,272
1,014,571
Aug.
479,000
1,716
695,504
1,031,036
Sept.
254,000
1,716
698,494
910,005
Oct.
404,000
1,716
698,494
995,002
Nov.
1,404,000
201,716
897,658
963,364
Dec.
1,404,000
461,206
1,149,825
1,018,136
Beutel was familiar with the financial situation of Guarantee, including its assets and earnings. South East made loans to Guarantee, and it was Beutel's duty in connection with those loans to determine *74 whether Guarantee's financial situation warranted them. Beutel got that information from the annual statements which Guarantee was required by law to file with the insurance departments or commissioners of the various states in which it was authorized to operate. The form of the annual statements, which are the financial and operating statements of the insurance company for the year, is prescribed by law, and they are required to be filed under oath and subject to the penalties of perjury. These annual statements are reviewed and examined by the state insurance authorities. At the end of 1956, Guarantee was licensed to conduct an insurance business in Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Missouri, Nebraska, Ohio, Tennessee, Virginia, and West Virginia. At the end of 1957, Guarantee was licensed to conduct an insurance business in Mississippi and Oklahoma, in addition to the foregoing states. City National Bank, located in downtown Chicago, was the main correspondent bank of South East. During 1957, it was the fourth or fifth largest bank in Chicago, on the basis of deposits. The surplus operating funds of South East were deposited at City National, *75 and City National had provided loans to Guarantee, and to petitioner, in excess of the legal limits to which South East, as a national bank, was subject in making loans to any one borrower. In his analysis of the financial situation of Guarantee, Beutel was counseled by William H. Miller, who was a director and senior vice president of City National in charge of the commercial lending department of that bank. Upon the application by Guarantee to South East for a loan in excess of the legal lending limit of South East, Beutel and the appropriate officers went to Miller's office to discuss the participation by City National in the balance of the loan. At those meetings, financial statements of Guarantee were produced for examination and discussed and questioned. In connection with a loan of substantially more than $1,000,000 made to Guarantee in about 1953 or 1954 for the purpose of acquiring another insurance company, the loan committee of South East, including Beutel, discussed the loan at a discount meeting, and the loan was then discussed with Miller, who examined the financial statements of Guarantee. Again, during 1955, Jaffe (with Kutak signing in effect as a guarantor) borrowed *76 $1,500,000, personally (referred to above), from City National of which South East loaned $250,000, and City National loaned the balance of $1,250,000. At that time, inasmuch as Guarantee stock was being used as collateral, Beutel investigated the financial situation and statements of Guarantee both on behalf of South East and, in conjunction with Miller, on behalf of City National. The Negotiations of Beutel for the Purchase of 4,167 Shares of Stock from Jaffe: As has been stated above, Kutak contacted Beutel and told him that Kutak had made the inquiry requested by Beutel, and Kutak had then confirmed the rumor that Jaffe desired to sell some shares of stock of Guarantee. This inquiry of Kutak was made early in 1957. After hearing from Kutak, Beutel called Jaffe and they made an appointment to meet. They met a few days later, either at South East Bank, or at the South Shore Country Club. Eugene Jaffe, petitioner's son, was also present. At that meeting, petitioner told Beutel that he needed $1,250,000 to pay off his debts immediately, or else he would lose everything he had and would be wiped out, and that he wanted to sell enough shares of Guarantee stock to realize that amount. *77 Petitioner specifically told Beutel that he did not want to borrow any money, but wanted to sell Guarantee stock. He told Beutel that he wanted to dispose of enough shares of his Guarantee stock to raise $1,250,000. The parties discussed the question of the price per share, and Jaffe expressed the opinion that the stock was worth between $300 and $350 per share, and Jaffe explained the reason for his opinion. He stated that it was based on the formula that Guarantee had applied in the past in purchasing insurance companies comparable to itself, and that the formula consisted of adding capital, plus surplus, plus one and one-half year's premium income, plus $20 per thousand for life insurance in force. It was agreed that because of Kutak's experience in the business and because of Beutel's confidence in him, they would discuss the price with Kutak. Beutel had to investigate his own ability to finance the purchase, and the question of price had to be resolved. Therefore, the matter was left for the moment in that posture. When Jaffe left Beutel, he went to Kutak to get the figures for the purpose of applying the formula. They consulted the 1956 annual statement of Guarantee which was *78 filed with the insurance departments of the states where Guarantee operated, and worked out the formula on the basis of the figures in that statement. On that basis they arrived at a figure of about $300 per share, "for a fast sale", as Jaffe stated it. As previously stated, Beutel was familiar with the business and financial situation of Guarantee. He was familiar with its 1956 financial statement. When Guarantee had previously purchased an insurance company known as National Protective Life Association of Kansas City, Guarantee had borrowed the required funds from City National and another bank, and Beutel had acted in an advisory capacity in making of those loans, which he always did in his work in arranging finances for Guarantee. Beutel did not seek the advice of anyone other than Kutak with respect to the value of the Guarantee stock owned by Jaffe, which was the subject of Beutel's inquiries in the spring of 1957, because Beutel relied on the opinion of Kutak as president of Guarantee, on his own (Beutel's) knowledge of Guarantee. Guarantee's assets and business had been closely analyzed in 1955 when Jaffe had obtained the loan of $1,500,000 from the South East Bank and City *79 National, for which all of the Guarantee stock had been pledged with City National as collateral; and Beutel was aware of that analysis. In addition to having the 1956 annual statement, Beutel knew in the spring of 1957 what the trend of Guarantee's business was at that time. Beutel considered that $300 per share was a sound price, both on the basis of a formula consisting of capital, plus surplus, plus a minimum of one year's premiums; and also because Guarantee's earnings had been over $1,700,000 during 1956, which was about $35 per share. Earnings of $35 per share for a period of 10 years would indicate a value of $350 per share for the stock of Guarantee. Ten year's earnings per share also is a method for arriving at the value of corporate stock. Beutel knew that the average insurance company stock was selling at from 15 to 18 times annual earnings. Immediately after his conversation with petitioner, Beutel met with Kutak and reviewed Jaffe's need for funds, and told Kutak that he, Beutel, intended asking for an option to purchase all of the Jaffe family's stock, 33,333 shares, in addition to the 4,167 shares which Jaffe had offered. Beutel stated that he would attempt a public *80 offering of that block of shares. Beutel inquired about Kutak's opinion of the value of the stock. Kutak's opinion was that the stock had a value of from $300 to $350 per share, based on the formula of adding capital, surplus, and one and one-half times premiums. Kutak had participated in making decisions concerning the acquisition by Guarantee of other insurance companies, and in the acquisitions of such companies before and after 1957; and in discussions relative to offers received for the purchase of the Guarantee stock before and after 1957. Kutak's experience in the foregoing matters was the basis for his general formula of capital, plus surplus, plus about one to one and one-half times premiums, for valuing the stock of Guarantee. Within the year prior to the trial of these cases, Globe Life Insurance Company of Oklahoma had offered to purchase Guarantee for $20,000,000, which price was arrived at by use of the formula of capital, plus surplus, plus one and one-half times premiums. In Kutak's experience in the insurance business, which went back to 1928, a particular standard had been established for valuation in the purchase and sale of insurance companies, and although *81 actuaries and analysts used various complicated factors, they essentially narrowed their method down to the formula of capital, plus surplus, plus one to one and one-half times premium income, which is a formula on the basis of which insurance companies were actually bought and sold to his knowledge. He told Beutel that based upon that approach, $300 per share would be a fair value for the stock. Jaffe also discussed with Kutak the value of the Guarantee stock for the purpose of a sale to Beutel. Kutak told petitioner substantially the same things that he had told Beutel, namely, that if he were placed in the position of an umpire, referee, or arbitrator, that the formula he had discussed with Beutel was fair (as petitioner, himself, knew), and that he (Kutak) had already told Beutel that the formula was proper; and that if an outsider were to place a value on the stock, the outsider would come up with approximately the same valuation as Kutak did. Petitioner was satisfied with Kutak's conclusion, which was substantially the same as his own. In arriving at his valuation, Kutak worked out the formula based upon the figures as of December 31, 1956, which were derived from the last *82 annual statement filed by Guarantee with the state insurance departments, prior to the proposed sale by petitioner of Guarantee stock to Beutel. His calculation was as follows: Guarantee Reserve Life Insurance Company
Capital and surplus
$ 5,936,041.09
Premiums collected during 1956
(both first year and renewal
business)
11,491,681.56
Total
$17,427,722.65
Outstanding shares
50,000.00
Value per share
$ 348.55
Kutak told Beutel that he was in an embarrassing position because he had been associated with Jaffe since 1940, but he wanted to give Beutel what he regarded as a proper criterion in the valuation of the stock. Beutel told Kutak that he would make inquiries among various bankers for the purpose of financing the proposed purchase of shares from petitioner. The value of from $300 to $350 per share, which Kutak had put on the Guarantee stock, was not predicated upon the size of the block of option shares, but was on the value per share of all, or a majority, of the stock of Guarantee. A minority holding was not, in his opinion, worth as much per share as either all the stock or the controlling stock of Guarantee. Beutel, also, did not believe that *83 a small bock of the stock was worth as much as $300 per share. At the meeting with Kutak, Beutel decided that he would offer petitioner $300 per share for the stock, both for the number of shares that he would purchase immediately, as well as for the option shares. Beutel knew that since he was going to have to borrow money in order to pay petitioner $1,250,000, the lender would not make the loan unless it believed the price was reasonable. Beutel's Application for a Loan: Beutel had to borrow funds to purchase the stock. South East has maintained close business and banking relations with City National Bank, which is the main correspondent bank of South East. South East keeps its surplus funds deposited at City National, and the balances averaged from $1,500,000 to $2,000,000, daily. Beutel, as of 1957, had frequently obtained, in the past, personal loans from City National, and he had known the senior vice-president in charge of the commercial loan department (also a director), William H. Miller, since the latter part of 1920. Miller had helped Beutel in obtaining the permit to organize the South East bank. Therefore, Beutel consulted Miller in the spring of 1957, about borrowing *84 funds from City National. Beutel told Miller that he planned buying about 4,100 shares of stock of Guarantee from Jaffe, and that he also hoped to secure an option to buy the balance of all of the stock in Guarantee owned by the Jaffe family, at $300 per share, which option would be Beutel's condition for his buying about 4,000 shares of Guarantee from Jaffe at the same price per share. With respect to collateral for a loan to Beutel, Beutel told Miller that he believed that Kutak would be willing to be a guarantor of Beutel's note, and also would agree that the 12,500 shares of stock of Guarantee owned by the Kutak family could be pledged with City National as collateral for a loan to Beutel. Beutel knew that Miller was well acquainted with the business and condition of the Guarantee insurance company. Beutel also told Miller that if he secured an option to buy all the rest of the Jaffe family's shares of stock, he intended to work out a public sale of the block of stock in Guarantee through a broker's underwriting thereof; that he would repay City National's loan to him out of the proceeds of the sale of the optioned, Jaffe stock; and that he hoped to realize $330 per share from *85 the underwriting of the public offering. Miller agreed to take up Beutel's loan application with the executive committee on loans. Beutel then met with Kutak at South East and told him that he thought he could borrow the $1,250,000 if Kutak would guarantee Beutel's loan at City National and support that guarantee with the Kutak family's 12,500 shares of Guarantee stock. Kutak was agreeable to Beutel's proposals. Within a few days after meeting with Miller, and during April 1957, Beutel met with Jaffe at South East, and told Jaffe that he thought he could raise the money to buy the stock that Jaffe wanted to sell. A price of $300 per share was agreed upon. Jaffe was satisfied with the price of $300 per share, because he was anxious to sell and use the proceeds to straighten out his affairs. Beutel then advised Jaffe for the first time that he would not make the deal unless he were given an option to buy all of the remaining balance of the Jaffe family's shares of Guarantee stock. He told Jaffe that he might want to make a public offering of the Jaffe stock or join with his friends in buying the company, and that he wanted the option to buy the rest of the Jaffe family stock at $300 *86 per share. At $300 per share, divided into a selling price of $1,250,100, the sale would be of 4,167 shares. Subtracting 4,167 from the Jaffe family holdings of 37,500 would leave 33,333 shares which would be the subject of the option that Beutel demanded. Jaffe told Beutel that he would have to discuss the matter with his family. Petitioner discussed the option request with the members of his family and the decision was made to accede. The Jaffes were motivated by the fact that all of their Guarantee stock was being held by City National as collateral on that bank's loan to petitioner, which had a remaining balance of $580,000, and that if petitioner did not get funds with which to pay that amount, they could lose all of their stock or lose control of the company. They were aware that if the option were exercised they would be paid $300 per share for the optioned shares, but they believed that to be a fair price. Jaffe originally had no thought of a sale of all of the Jaffe stock in Guarantee, but instead of a sale of just enough of his own shares to meet his obligations. Guarantee was a good company and he saw no point to selling all of it. However, Beutel's demand left the family *87 no alternative. Thereupon, petitioner telephoned Beutel and told him that he could have the option to purchase the 33,333 remaining shares. This was in the early part of May 1957. Beutel then advised Miller that Kutak had agreed to guarantee the loan from City National to Beutel, and to put up the Kutak family stock as collateral; and that Beutel had a commitment for an option on the remaining 33,333 shares of the Jaffe stock. About ten days later, Miller told Beutel that the loan of $1,250,000 to Beutel had been approved by City National. On May 22, 1957, Beutel was in Miller's office at City National and was being told that the bank had approved the loan to him of $1,250,000. When he left Miller's office, the Chicago Daily News was on the newsstands, carrying an article that made serious innuendoes about Guarantee and referred to a possible investigation of that company. The article criticized some of the lending activities of Guarantee and some of the activities of Jaffe; it referred to the large mortgage that Guarantee had on the Tropicana Hotel in Las Vegas, with which Jaffe was associated, and to a mortgage on a piece of property at Lake Tahoe with which Jaffe also was *88 identified; and it also referred to a mortgage on the River Road Motel in suburban Chicago. Title to the River Road property was held in the name of a bank under an Illinois land trust, a vehicle frequently used to conceal the identity of the actual owners. The article insinuated that the owners of the property represented hoodlum elements. Actually, Guarantee had purchased the mortgage from a bank neighboring South East. The mortgage had been offered to South East as part of a group when a bank which owned it got into difficulty, but it was a type of mortgage that South East could not hold because the national bank regulations prohibited national banks from taking trust deed mortgages. The article stated that the Indiana Insurance Department objected to the loans made by Guarantee to companies operated or controlled by petitioner. Beutel was fearful about the effects of the newspaper article and he arranged to meet Jaffe on May 23 at South East. Beutel told Jaffe that the adverse publicity in the preceding day's newspaper concerning Guarantee and the possible investigation of the company was causing him serious concern about the success of his efforts to accomplish an underwriting *89 within the time of his option and the maturity of his loan, and that he did not want to get "boxed in." Beutel said that if the investigation was going to take some time, and if it was going to cause trouble with underwriters about this proposed public offering, that he would be fearful about how he would be able to pay his, Beutel's, note to City National. He told Jaffe that he, Beutel, wanted a "vehicle" which would enable him to dispose of the 4,167 shares in the event that he "ran into a roadblock." Specifically, Beutel said that he wanted some sort of device by which Guarantee would take the stock if he, Beutel, could not complete the underwriting, and that he wanted matters so arranged that if his efforts to sell the purchased and optioned shares in a public offering were blocked, in view of the bad publicity, he would be protected by such arrangement which would enable him to cause Guarantee to buy his 4,167 shares from him, Beutel; and that furthermore, in order to protect the minimum $30 per share profit that Beutel expected to make, in the event of a successful underwriting, he wanted the price at which he could sell the 4,167 shares to Guarantee to be $330 per share. Jaffe *90 was upset by this request as he believed that the matter had already been agreed upon and ended. Jaffe replied that he would go back to his family again, discuss this new matter with them, and see if they would agree to the demand. Jaffe then talked to his family and they agreed to give Beutel what he wanted. At that time in 1957, petitioner had reached a point and he thought his family had reached a point that if they sell the company for $300 per share they would not have cared. Jaffe telephoned Beutel and told him that the family had agreed to Beutel's demand, to which Beutel replied that they "had a deal", and they agreed that the necessary documents would be drawn and the deal would be closed. At the time that Beutel spoke to petitioner about the protection that he wanted in case the adverse publicity should adversely affect his efforts to sell publicly, in a public offering, the stock of the company, he also discussed the matter with Kutak, and told Kutak about his concern over the situation, and his request to Jaffe to furnish him with some form of protection in the event that the publicity "dirtied the water." Kutak agreed to give Beutel an agreement to purchase the 4,167 *91 shares from him as additional protection. Miller gave Beutel the City National commitment to loan him $1,250,000 without knowledge of the protective agreement that Beutel had demanded from the Jaffes. The City National commitment was made to Beutel before he asked Jaffe for that agreement. The minutes of a meeting of the City National loan committee on May 13, 1957, read as follows: CLARENCE A. BEUTEL J. F. KUTAK - Loan up to $1,250,000 secured by all of the capital stock (50,000 shares) of the Guarantee Reserve Life Insurance Company to January 15, 1958, approved. Present loan to Jaffe and Kutak with a balance here of $450,000 and a balance of $130,000 at the South East National Bank to be paid from the proceeds of this new loan. South East National Bank to participate in the new credit to the extent of their legal limit, $212,500, if Mr. Beutel does not become a signer on the note. Miller's first contact with Beutel was merely to determine whether City National would lend $1,250,000, and the gist of the committee minutes was that the bank would lend that amount, with the details to be worked out. A loan by City National does not always go through on the basis of a first contact. *92 When the loan was first discussed, it was discussed along the lines set forth in the minutes of the loan committee meeting. A loan of the size involved had to be referred to the executive committee of City National. The minutes of a meeting of the executive committee of City National on May 14, 1957, read, in relevant part, as follows: Clarence A. Beutel J. F. Kutak, et al. Loan of $1,250,000 to 1/15/58 secured by 50,000 shares (all) stock of Guarantee Reserve Life Insurance Co. Loan agreement. (Present loan to Ben Jaffe and J. F. Kutak ($580,000) to be paid) This was merely a confirmation of the loan committee minutes, and nothing more. The foregoing minutes of both committees were of the preliminary meetings. A loan is always subject to change either on the part of the borrower or the bank. The minutes of a meeting of the executive committee of City National on June 4, 1957, read in relevant part, as follows: Clarence A. Beutel, J. F. Kutak, et al. Change in collateral on loan of $1,250,000, approved 5/14/57 from all of capital stock of Guarantee Reserve Life Insurance Company to 16,667 shares plus 2,000 shares of South East National Bank stock. The reason for *93 the use of the term "et al", after Kutak's name, was that it was unnecessary or a misprint. In any event, the loan went through with Beutel's name only on the note. City National made the loan to Beutel. An Information Sheet, dated June 5, 1957, which appears in the credit file of Beutel on this loan, and setting forth some of the details in connection with the loan, reads as follows: INFORMATION SHEET NAME: CLARENCE A. BEUTEL c/o The South East National Bank, 1180 East 63rd Street, Chicago 37, Illinois
DATE 6-5-57 W H Miller We have agreed to loan Clarence Beutel $1,250,000.00 to be paid at maturity in January 1958. The loan will be secured by 4167 shares Guarantee Reserve Life Insurance Company of Hammond stock, which Mr. Beutel is purchasing, 2,000 shares South East National Bank stock, and, in addition, 12,500 shares of Guarantee Reserve Life Insurance Company of Hammond owned by Mr. J. F. Kutak, President of the insurance company, to support his guarantee covering the loan. Mr. Beutel has been given an option to purchase the balance of the stock, consisting of approximately 33,000 shares, until January 1958 and the shares of stock of the life insurance company covered *94 by the option are held in safekeeping in proper delivery form. As a result we will hold approximately 49,667 shares of the insurance company stock in our files until the loan is paid, and it is anticipated all of the stock will be disposed of at or before maturity of the loan. The question of a borrower's retirement program of a bank loan is sometimes asked, and sometimes is not, all depending upon with whom the bank is dealing. The discussion with Miller at the time was about selling Guarantee. As far as the City National loan committee was concerned, it would have no reason to question Beutel's program for retirement of the loan. He had been doing business with the City National for a long period of years, and City National had handled many loans, both for his bank and for him, and the loans had always been repaid. As far as City National was concerned, this was a loan with a certain maturity, and City National's officers believed that it would be paid when it became due. City National did not receive assurance from anyone that Guarantee would "stand behind" Beutel's loan if he were unable to pay it. The only security that City National had was shown on Beutel's collateral card, *95 and nothing more. Miller did not see any agreement by which Beutel would have been enable to sell the 4,167 shares to Guarantee. The security to City National was 16,667 shares of Guarantee stock, of which 4,167 shares were in Beutel's name, and 12,500 shares were in the names of Kutak or the Kutak family trusts, and 2,000 shares of South East stock, which were in Beutel's name. The details of the loan to Beutel were worked out in final form between May 14, 1957, the date of approval of the loan, and June 5, 1957, when the loan was made and closed. Miller had no assurance from Kutak, as president of Guarantee, that the loan to Beutel would be paid if Beutel were unable to do so, or that Guarantee would purchase Beutel's stock. City National relies to some extent on the financial position of the borrower, as well as on the value of the collateral. The bank is not required to ask for security having a value equal to a certain percentage of the loan, but it does so, in practice. Ordinarily City National would loan up to 60 or 80 percent of the value of the security, depending upon the individual. The value of the collateral for the Beutel loan was far in excess of $1,250,000. When *96 City National made the loan of $1,250,000 to Beutel, it consulted one of the good insurance agencies and asked them for a quotation on the Guarantee stock. It also consulted a competitor of Guarantee and gave them the facts and figures relating to Guarantee, without divulging its name. From the opinion given to the bank by the competitor it concluded that it had collateral worth at least $1,400,000 in the Guarantee stock, alone, without taking into account the South East stock. When the negotiation of the details between Jaffe and Beutel was completed, the documents for the transaction were prepared by the firm of attorneys who represented Guarantee and Jaffe, personally. As to Kutak's agreement to purchase the 4,167 shares from Beutel, Kutak believes that agreement might have been drawn by the attorneys for City National. The transaction was closed at City National on June 5, 1957. There were present Miller, Beutel, Jaffe, Kutak, Waldron (a bank attorney), an attorney representing Jaffe, Kutak's son, and perhaps Eugene Jaffe, Jaffe's son. On June 5, 1957, at the closing at City National, the following occurred, and the following documentation was delivered: A. Beutel executed *97 and delivered to City National a printed form note, No. 20636D, dated June 5, 1957, maturing January 15, 1958, in the principal amount of $1,250,000, bearing interest, payable at maturity, at the rate of 5% per annum. The note stated that Beutel pledged with City National "4167 Shares of Guarantee Reserve Life Insurance Co., represented by Certificate No. 68 and sundry other securities." B. Kutak executed and delivered to City National a printed form designated as "Continuing Guarantee," dated June 5, 1957, which read in relevant part as follows: FOR VALUE RECEIVED and in consideration of advances made or to be made, or credit given or to be given, or other financial accommodation from time to time afforded or to be afforded to Clarence A. Beutel (hereinafter called the "Debtor"), by CITY NATIONAL * * * (* * * called the "Bank"), the undersigned hereby guarantees the full and prompt payment to the Bank at maturity and at all times thereafter of all indebtedness, obligations and liabilities of every kind and nature of the Debtor to the Bank * * * howsoever evidenced, whether now existing or hereafter created or arising * * *; and the undersigned further agrees to pay all expenses *98 * * * paid or incurred by the Bank in endeavoring to collect such indebtedness * * * and to enforce this guaranty. The term "guaranteed debt," as used herein, shall be deemed to mean and include all said indebtedness, obligations and liabilities, including interest, and all said expenses. The right of recovery, however, against the undersigned is limited to ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000) plus interest of all guaranteed debt at the respective rates borne thereby, and also plus all expenses aforesaid. * * *
The undersigned hereby pledges to the Bank and agrees that the Bank shall have a lien upon any and all property of every kind and description of the undersigned now or hereafter in the Bank's possession or control, as security for the payment of all guaranteed debt, and in case of default in the payment of any guaranteed debt * * * the Bank may * * * sell said property, or any part thereof * * * and apply the proceeds of any such sale * * * after deducting all costs and expenses * * * to the payment of the guaranteed debt * * *. * * *
The provisions hereof shall be binding upon the undersigned and upon the heirs, legal representatives, *99 successors and assigns of the undersigned. C. On June 5, 1957, Jerome F. Kutak and Robert J. Kutak, as Voting Trustees under Voting Trust Agreement dated October 15, 1954, (the Kutak Family Voting Trust Agreement) executed an instrument whereby they pledged 12,400 shares of Guarantee with City National, as security for the obligation of Kutak under his aforesaid Continuing Guarantee. This was a printed form document, which is incorporated herein by reference. D. Kutak and his 4 children, as the beneficial holders of the Guarantee stock under the Kutak Family Voting Trust, directed the voting trustees to pledge that stock with City National as security for the obligation of Kutak under the Continuing Guarantee. The direction, delivered to City National, was contained in an instrument dated June 5, 1957, designated, "Direction To Trustees"; it is incorporated herein by reference. E. In and by a stock power dated June 5, 1957, executed by Jerome F. Kutak and Robert J. Kutak, as voting trustees under the Voting Trust Agreement dated October 15, 1954, they assigned in blank 12,400 shares of Guarantee stock standing in their names on the books of Guarantee. In and by a stock power *100 dated June 5, 1957, executed by Jerome F. Kutak, he assigned in blank 100 shares of Guarantee standing in his name on the books of Guarantee. The stock powers, together with the 12,500 shares of Guarantee, were deposited and pledged with City National on June 5, 1957. F. On June 5, 1957, the members of the Jaffe family who owned the voting trust certificates representing the shares of Guarantee stock which were held by voting trustees under Voting Trust Agreement dated November 15, 1952 (the Jaffe Family Voting Trust Agreement), directed the voting trustees to grant to Beutel an option to purchase all the Guarantee stock held under the voting trust agreement, and to give to Beutel a certain "irrevocable proxy" with respect to the optioned stock. The direction was contained in an instrument dated June 5, 1957, designated "Direction To Trustees," and reads as follows: The undersigned, owners of all the voting trust certificates issued and at this date outstanding under the Jaffe Family Voting Trust Agreement dated November 15, 1952, as amended by agreements dated April 15, 1953, and June 1, 1957, do hereby authorize and direct the voting trustees under said trust agreement to grant *101 to Clarence A. Beutel an option to purchase all the stock of Guarantee Reserve Life Insurance Company held under said trust agreement, being 29,633 1/3 shares, at a price of $300.00 a share at any time prior to the close of business on January 15, 1958, and also to give to Clarence A. Beutel an irrevocable proxy, expiring at the close of business Jan. 16, 1958, to vote all of the stock covered by said option, the option and proxy to contain such terms, conditions and limitations as said voting trustees shall determine to be in the best interests of the undersigned. G. On June 5, 1957, Jaffe executed an instrument designated a "Trustee's Certification" in which he certified that the aforesaid voting trust agreement and amendments thereto constituted a true and complete copy, as in force on that date, of the Jaffe Family Voting Trust Agreement and amendments thereto; that he was one of the voting trustees thereof and had charge of the books and records of the trust; and that the persons who owned the beneficial interests under the trust and the amount of their interests were as set out in the Certification. H. By an instrument dated June 5, 1957, Ben Jaffe and Eugene Jaffe, as voting *102 trustees under the Jaffe Family Voting Trust Agreement, and the other members of the Jaffe family who owned Guarantee stock outright, granted to Beutel an option to purchase all of the balance of the Guarantee stock owned by the Jaffe family outright or through the voting trust (a total of 33,333 shares) at a price of $300 per share, said option to remain in effect until the close of business on January 15, 1958. The instrument reads as follows: FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the undersigned do hereby give and grant to CLARENCE A. BEUTEL the right or option to purchase, as a unit, 33,333 shares of the capital stock of GUARANTEE RESERVE LIFE INSURANCE COMPANY OF HAMMOND, INDIANA (hereinafter called "the Company"), at a price of $300 per share. This option shall remain in effect to the close of business on January 15, 1958, and may be exercised by depositing the purchase price in cash or bank checks, payable to the undersigned, in accordance with the list of shares deposited in escrow set opposite their respective names, with the Escrowee on or before the expiration of this option. If this option is not exercised *103 on or prior to January 15, 1958, all stock deposited in escrow shall be returned to the depositors on January 16, 1958, by delivering said shares of stock so deposited in escrow to Ben Jaffe, 216 W. Jackson Boulevard, Chicago, Illinois, as agent for all of the undersigned. If this option is exercised in accordance with its terms, the consideration received by the Escrowee shall be forthwith turned over to the undersigned by delivery thereof to Ben Jaffe, as Agent for all of the undersigned, at 216 W. Jackson Boulevard, Chicago, Illinois. The undersigned have herewith deposited an aggregate of 33,333 shares of stock of the Company, with executed stock powers attached, with the City National Bank and Trust Company of Chicago, as Escrowee, under and pursuant to the terms hereof. The undersigned will not prior to January 15, 1958, sell, pledge, hypothecate, or otherwise dispose of any of said shares of stock so deposited with said Escrowee, nor contract for the sale or other disposition thereof without Beutel's written consent. Neither anything herein contained nor the acceptance by the Escrowee of said stock, together with this option, shall be deemed to impose any liability whatsoever *104 on the Escrow [Escrowee] for any act or omission to act, by said Escrowee in good faith. WITNESS the hands and seals of the undersigned this 5th day of June, 1957. BEN JAFFE and EUGENE JAFFE, as Voting Trustees under Voting Trust Agreement dated November 15, 1952, as amended by Agreements dated April 15, 1953 and June 1, 1957 (signed) Ben Jaffe (signed) Eugene Jaffe (signed) Ben Jaffe / Ben Jaffe (signed) Eugene Jaffe / Eugene Jaffe (signed) Elsie Jaffe / Elsie Jaffe (signed) Evelyn Jaffe / Evelyn Jaffe (signed) Robert Weiss / Robert Weiss (signed) Richard Seidel / Richard Seidel (signed) Richard D. Slott / Richard Slott (signed) Clarence A. Beutel I. By stock powers dated June 5, 1957, executed by Ben Jaffe and Eugene Jaffe as voting trustees under the Jaffe Family Voting Trust Agreement, and by the individual members of the Jaffe Family who owned shares of Guarantee stock outright (outside of the voting trust agreement), they assigned in blank the remaining 33,333 shares of Guarantee stock that were owned by the Jaffe Family outright or through their voting trust. J. On June 5, 1957, the aforesaid option agreement, the Direction to Trustees executed *105 by the beneficial holders under the Jaffe Family Voting Trust Agreement, a copy of the Jaffe Family Voting Trust Agreement, the Trustee's Certification executed by petitioner, and the certificates evidencing the aforesaid 33,333 shares of Guarantee stock with the aforesaid stock powers attached to them, were all deposited with City National against its "Temporary Safekeeping Receipt," No. 69590. This instrument was dated June 5, 1957, and was signed by Alfred H. Lindgren, vice president of City National. It recited that there were received from "Clarence A. Beutel and Ben Jaffe (as agent for the parties to Agreement dated June 5, 1957) as their interests appear under said Agreement dated June 5, 1957, a copy of which is attached hereto as Exhibit A," the following: (1) 33,333 shares of stock of Guarantee evidenced by numbered certificates issued in the names of members of the Jaffe family and the trustees under the Jaffe Family Voting Trust Agreement, all having stock powers attached. (2) Executed copy of Agreement, Exhibit A. (3) Executed copy of Direction of Trustees. (4) Executed copy of Voting Trust Agreement with Trustees Certification attached. A printed note appearing *106 below the body of the receipt and above the signature line, reads in relevant part as follows: NOTE - The acceptance of this memorandum receipt constitutes an agreement that the securities or property listed above are accepted by this Bank for the temporary accommodation of the depositor only and that the Bank does not assume any responsibility other than reasonable care for their safekeeping. This safekeeping receipt was issued to Jaffe and Beutel. The 33,333 shares were held by City National as security for Beutel's option to purchase those shares. They were not held by City National as collateral for its loan of $1,250,000 to Beutel. K. On June 5, 1957, the members of the Jaffe family and the trustees under the Jaffe Family Voting Trust Agreement and Beutel executed a "Memorandum of Agreement." That agreement reads as follows: MEMORANDUM OF AGREEMENT this day made between BEN JAFFE and EUGENE JAFFE, as Voting Trustees under Voting Trust Agreement dated November 15, 1952, as amended by Agreements dated April 15, 1953, and June 1, 1957, BEN JAFFE, EUGENE JAFFE, ELSIE JAFFE, EVELYN JAFFE, ROBERT WEISS, RICHARD SEIDEL and RICHARD SLOTT (herein collectively sometimes called "JAFFE *107 FAMILY"), and CLARENCE A. BEUTEL; WITNESSETH: WHEREAS, Beutel is contemporaneously purchasing from Ben Jaffe individually 4,167 shares of the stock of Guarantee Reserve Life Insurance Company of Hammond, Indiana, (hereinafter called "the Company"), for the sum of ONE MILLION TWO HUNDRED FIFTY THOUSAND ONE HUNDRED DOLLARS ($1,250,100), all or part of which Beutel is purchasing for investment and not with a view to distribution, except that Beutel may sell all or a portion thereof to not more than four of his associates upon receiving and delivering to Ben Jaffe an "investment letter"; and WHEREAS, the Jaffe Family has granted Beutel an option on 33,333 shares of stock of the Company; NOW, THEREFORE, it is agreed: 1. The Jaffe Family has given to Beutel proxies to vote said 33,333 shares of stock of the Company after January 15, 1958, on the following understandings and conditions: (a) Said proxies are coupled with an interest and shall be irrevocable to January 17, 1958, unless terminated pursuant hereto; (b) Said proxies shall be void and of no effect (1) unless subsequent to January 1, 1958, and prior to January 10, 1958, Beutel shall have offered to sell the aforesaid *108 4,167 shares of stock of the Company at a price of not to exceed $1,375,110, and said stock shall not be purchased by the Company by the close of business on January 15, 1958, or (2) in the event that Beutel shall at any time sell, transfer or dispose of all or substantially all of said stock to some purchaser other than the Company; (c) Said proxies shall not be usable for any purpose except to elect a majority of the Board of Directors of the Company, who shall all execute resignations prior to assuming office and shall use such office of director only for the purpose of taking action to cause the purchase by the Company of said 4,167 shares of common stock of the Company at the price of $1,375,110 and for no other purpose; said majority of the Board of Directors so elected shall not remain in office longer than is necessary to cause the said purchase of said 4,167 shares, which shall be done as promptly as possible. Said members of the Board of Directors so elected shall not take any action, or cause the Company to take any action, to affect adversely the rights of any of the Jaffe Family, or to enter into any contracts or other arrangements which would adversely affect such rights *109 or would bind, obligate or adversely affect the Company. (d) The resignations of said majority members of the Board of Directors shall be posted in escrow with John J. Waldron, 231 S. La Salle St., Chicago, Ill. for delivery to Ben Jaffe on behalf of all the members of the Jaffe Family to insure the carrying out of the purposes of Item (c) above. 2. Beutel agrees that the provisions and purposes of paragraph 1(b), (c) and (d) of this Agreement shall be carried out and observed, and that said majority of the Board of Directors, if elected by such proxies, shall take only such action as may be necessary to carry out the provisions and purposes of pargraph 1(c) and 1(d) with the greatest dispatch. 3. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns hereof, provided that Beutel shall not make any assignment hereof without the prior consent of Ben Jaffe. WITNESS the hands and seals of the parties hereto this 5th day of June, 1957. BEN JAFFE and EUGENE JAFFE, as Voting Trustees under Voting Trust Agreement dated 11/15/52, as amended by Agreements dated 4/15/53 and 6/1/57 (signed) Ben Jaffe (SEAL) (signed) Eugene *110 Jaffe (SEAL) (signed) Ben Jaffe / Ben Jaffe (SEAL) (signed) Eugene Jaffe / Eugene Jaffe (SEAL) (signed) Elsie Jaffe / Elsie Jaffe (SEAL) (signed) Evelyn Jaffe / Evelyn Jaffe (SEAL) (signed) Robert Weiss / Robert Weiss (SEAL) (signed) Richard Seidel / Richard Seidel (SEAL) (signed) Richard Slott / Richard Slott (SEAL) (signed) Clarence A. Beutel / Clarence A. Beutel (SEAL) L. On June 4, 1957, Kutak and Beutel entered into a Memorandum Agreement as follows: MEMORANDUM AGREEMENT The undersigned, CLARENCE A. BEUTEL, is this day purchasing from BEN JAFFE, Four Thousand One Hundred Sixty Seven (4,167) shares of GUARANTEE RESERVE LIFE INSURANCE COMPANY OF HAMMOND, INDIANA, depositing the same as security for a loan of ONE MILLION TWO HUNDRED FIFTY THOUSAND ONE HUNDRED DOLLARS ($1,250,100), made by the City National Bank & Trust Company, to Clarence Beutel. In addition to depositing said stock with said Bank as collateral, the undersigned, J. F. KUTAK, is depositing, or is arranging with others for the deposit of an aggregate of Twelve Thousand Five Hundred (12,500) shares as collateral security to said loan. In consideration of the premises and of other good and *111 valuable consideration moving between the parties, the undersigned, J. F. KUTAK, agrees that if on or before January 16, 1958, the undersigned Beutel has not sold all of said stock at not less than Three Hundred Thirty Dollars ( $330) a share, then the undersigned Kutak will, without formal notice or demand, pay to Beutel in cash an amount equal to One Million Three Hundred Seventy-five Thousand One Hundred Ten Dollars ($1,375,110) for all said stock then owned by Beutel. In any event, Kutak undertakes hereby to save and hold harmless the said Beutel from any loss through any cause connected with the purchase of said stock from said Jaffe and the making of the loan aforesaid with the said City National Bank & Trust Company. WITNESS our hands and seals this 4th day of June, 1957. (signed) J. F. Kutak / J. F. Kutak (SEAL) (signed) Clarence A. Beutel / Clarence A. Beutel (SEAL) M. On June 5, 1957, City National issued its receipt to Beutel acknowledging receipt of the following collateral for his loan of $1,250,000: Description
Number
of
Shares
Guarantee Reserve Life Insurance Com-
pany of Hammond #61 [*] 12,400 sh.
#60 [*] 100 sh.
12,500
Guarantee Reserve Life Insurance Com-
pany of Hammond T/R
4,167
The South East National Bank of
Chicago
2,000
#499-500-174-175-177-178/80-38-39-502/
508 [*] 100 shares each
#48/53 [*] 50 shares each
Direction to Trustees signed by Jerome
F. Kutak et al. dated 6/5/57
The following appeared at the bottom of the
receipt: New Loan
$1,250,000.00
Loaning Officer WHM
*112 The receipt was signed by K. Rosek, Teller. The 12,500 shares of Guarantee stock were the shares owned by the Kutak family and delivered to City National by Kutak. The trust receipt for the 4,167 shares of Guarantee stock evidenced 4,167 shares of Guarantee stock evidenced 4,167 shares of Guarantee stock which were owned by and were to be deposited by Beutel. The 2,000 shares of South East stock were owned by Beutel. The "Direction to Trustees" was the aforesaid Direction referred to above. N. The 2-page City National collateral card respecting the account of Beutel, and showing the deposits made to secure the bank's loan to him of $1,250,000, showed on the first page that on June 5, 1957, the following were received: Serial or Iden-
Number
tification
of
Description
Number
Shares
Guarantee Reserve Life
#61
12,400
Insurance Co. of Ham-
mond
do
#60
100
Guarantee Reserve Life
T/R
4,167
Insurance Co. of Ham-
mond
The South East Na-
#499 and 500
200
tional Bank of Chicago
at 100 shs.
ea.
do
#174 and 175
200
at 100 shs.
ea.
do
#177 to 180
400
at 100 shs.
ea.
do
#38 and 39
200
at 100 shs.
ea.
do
#502 to 508
700
at 100 shs.
ea.
do
#48 to 53 at
300
50 shs. ea.
*113 Trustees Certification and Copy of Voting Trust Agreement Direction to Trustees signed by Jerome Kutak, et al. dated 6/5/57. The Trustees Certification, Voting Trust Agreement, and Direction to Trustees referred to in the collateral card are the documents referred to above as Exhibits 15-0, 19-S, and 18-R, respectively. The 4,167 shares shown as covered by a T/R (trust receipt) were lined out and shown as having been delivered back (returned) on June 7, 1957. The second page of the collateral card then shows that on June 7, 1957, City National received Guarantee Reserve Life Insurance Company of Hammond $10 par value capital stock, Certificate # 72 for 4,167 shares. This certificate was dated June 6, 1957. It was the certificate issued to Beutel upon his purchase of 4,167 shares from petitioner, and was deposited by Beutel with City National, together with an attached stock power executed by Beutel in blank. Certificate # 72 was in replacement of Certificate # 68 dated June 5, 1957, issued to Jaffe, evidencing his ownership of 4,167 shares of Guarantee stock. Certificate No. 68 was endorsed by Jaffe and delivered to Guarantee for cancellation and reissuance in the name of Beutel *114 as Certificate No. 72. The only collateral that City National had for the loan to Beutel was that shown on the collateral card, namely, the 16,667 shares of Guarantee stock, and the 2,000 shares of South East stock. O. On June 5, 1957, City National issued its cashier's check No. D33625, payable to the order of Beutel, in the sum of $1,250,000, its loan to him. The check was endorsed for deposit by Beutel and the proceeds were deposited in his account at South East. P. On June 5, 1957, Beutel delivered to petitioner a check for $1,250,100, dated June 6, 1957, drawn on Beutel's account at South East, in payment for the 4,167 shares at $300 per share. With the $1,250,100 sale proceeds received from Beutel, Jaffe paid the balance of $580,000 that he owed on the City National loan, plus interest; he paid the balance in excess of $400,000 that he owed to First National, plus interest; and he paid $190,000 that he owed in federal income tax for 1956. The payment of the balance of the loan to Jaffe at City National released the collateral and enabled the Jaffe family stock to be placed in safekeeping for Beutel's option. As stated above, the final agreement that Beutel demanded *115 from the Jaffes provided that Beutel was purchasing petitioner's Guarantee stock for investment and not with a view to distribution, except that Beutel could sell all or a portion thereof to not more than four of his associates upon receiving and delivering to petitioner an "investment letter." This clause itself was in the nature of an "investment letter", a commonly-used device which is designed to protect sellers (Jaffe in this instance) from being charged with a violation of the Securities Act of 1933. In the absence of such a provision, if the purchaser (Beutel in this instance) should sell any of the shares in a public offering without registering them with the Securities and Exchange Commission, the seller could be found guilty of violating the Securities Act. The letter, in effect, is evidence that the seller is selling on the buyer's representation that the latter is not purchasing for subsequent public distribution without conforming with the requirements of the Securities Act, and in reliance on such representation. Beutel could have sold the shares to a limited number of informed investors without registering the shares with the Commission and he would not have been guilty *116 of breaching the terms of the proxy agreement, as this would be exempt from the registration requirements of the Securities Act as a "private offering." Furthermore, without violating the foregoing provision of the proxy agreement, Beutel could have sold the shares in a public offering provided that he registered the shares with the Securities and Exchange Commission prior to such a public offering. When Beutel subsequently negotiated with underwriters in attempting to arrange for a public offering of the Guarantee shares, he did not violate either the aforesaid terms of the proxy agreement or the Securities Act, because such preliminary negotiations are made exempt from the Securities Act. Beutel's Efforts to Make a Public Offering of Guarantee Stock In addition to his experience as a banker, Beutel was experienced in the distribution of corporate stocks. He was instrumental in organizing the Colonial Bank and Trust Company, which involved the distribution of the stock of that bank. Beutel was the underwriter himself, and was in charge of the selling of the stock. He also had organized the Midwest Bank & Trust Company of Elmwood Park. Beutel then placed over $1,000,000 of the *117 stock of that bank, on the basis of his recommendations. Beutel believed that he had sufficient time within which to develop an underwriting of the Guarantee Stock; that is to say, to obtain a commitment from an underwriting house. Once he had an underwriting commitment, he believed that he would be able to secure an extension of his loan at City National; and with a commitment, he would be able to borrow the money necessary to exercise the option to acquire the Jaffe family stock in Guarantee. That would have been a usual banking practice. Beutel began early to investigate the making of a public offering of the Guarantee stock through an underwriting. Simultaneously, he got together a group of associates and friends, including Kutak, who with himself would be the control group in a public distribution and sale of the block of Guarantee stock of the Jaffe family covered by his option. From the public sale of those 33,333 shares of stock, he expected that he could realize a net sum, after commissions, with which he would pay the City National loan to him of $1,250,000. Beutel's efforts to locate a broker, or to form a syndicate, which would negotiate a public offering of the 33,333 *118 shares of option stock began at once after June 5, 1957, and numerous discussions took place with the executives of several securities brokerage firms, and with individuals. Beutel had discussions about the underwriting of a public offering of the option stock with the following individuals who represented the securities firms named: John Remer, a general manager of Drexel and Company of Philadelphia; Russell Moon, Clarence Werner, Robert Storey, and Robert Sjostrom of Shearson, Hammill & Co., of Chicago; Harry McDonald, formerly the head of the Securities and Exchange Commission (SEC); Carmen S. Brown of C. S. Brown and Company of Chicago; Harold Meitus, president of Superior Match Company and a stockholder and director of the South East Bank, whose personal net worth was in excess of $1,000,000; Samuel R. Segal, a stockholder and director of South East, owning substantial real estate interests; Paul Caspers; Plast; John Wilhelm, president of the Hoosier State Bank; Larry Murphy, president of Calumet National Bank; Arthur Kiefer, a vice-president of Mercantile Bank. Beutel offered the Guarantee stock to Harry McDonald for from $310 to $350 per share. McDonald delayed giving his *119 answer until November 1957 because he then was considering acquiring an insurance company, American Investment Security. McDonald acquired that company in November 1957; therefore, he was unable to consider Beutel's offer, because he had invested all of his available funds. At the same time while Beutel had conferences with security firms about a public offering of the option stock, he also talked with individual investors, business associates and friends, in order to organize a group who would acquire enough stock to give them effective and practical control of Guarantee, in the event that he was able to bring about a public sale and distribution of the stock. Kutak participated in these discussions. Harold Meitus, who had known Beutel for many years, agreed to join such group by purchasing shares in such number as Beutel would recommend, possibly from $50,000 to $10,000. Previously, at Beutel's suggestion, Meitus had purchased additional shares of stock of the South East bank and around $10,000 of stock in Midwest Trust and Savings Bank. Samuel Segal, who had known Beutel for 25 years, and Kutak for 10 years, at first expressed his interest in buying $100,000 of Guarantee stock. *120 He was interested in becoming a member of a controlling group, but was not interested in buying shares offered in a public offering. Carmen Brown (C. S. Brown & Co.), a large stockholder in the South East bank, actively assisted Beutel in his efforts to secure the underwriting of a public offering, and Brown committed himself to buy at least $250,000 of Guarantee stock. Brown brought to the attention of John Remer (partner in Drexel & Co.) the efforts of Beutel to secure a public offering. Remer was in Drexel's new business department which handles new corporate underwritings, acquisitions, and mergers. Brown also brought the matter to the attention of Russell Moon, with Shearson, Hammill. In the course of discussions about a public offering with the various representatives of underwriting firms, Beutel provided for their inspection annual financial statements of Guarantee and informed them about the operations of the business, the managerial policies, its assets, and general figures. In the fall of 1957, Beutel, Kutak, Brown and Segal, with others, were on a social trip to Montana (where they attended a wedding), and during this time there were discussions about the proposed underwriting *121 and purchases of Guarantee stock by a "control" group. Kutak explained (during this trip) how he arrived at a valuation and selling price per share of the stock, what the present earnings of Guarantee were, and what he expected as the future of its business. On other occasions, Kutak discussed the sale of Guarantee stock with John Wilhelm, president of Hoosier State Bank, Larry Murphy, Mercantile Bank, and with representatives of underwriting firms, including Remer of Drexel & Co. The reasons for the proposed public offering and offerings to individual investors were explained. Remer (Drexel & Co.) was interested in the idea of the underwriting because at the time he had a group of clients who wanted to buy all of the stock of a life insurance company, and had asked Remer to locate a company. Remer thought this group might be induced to become interested in Guarantee; it is in part a life insurance company. Beutel and Kutak explained that all of the Guarantee stock was not on sale. Remer examined the annual statements of Guarantee. He also explained the nature and timing of underwriting operations, prices, and so forth, and expressed the belief that an underwriting procedure for *122 the option stock might be completed in 90 days after they were started. However, Remer concluded that Drexel Company would not be interested in underwriting an offering of the Guarantee option stock. Immediately after June 5, 1957, Beutel began discussions with Shearson, Hammill & Co., a Chicago security house. Russell Moon, an employee of Shearson, had variously been in its trading department, bond department, and institutional department, and in 1957, he was in the institutional department, which was responsible for selling securities at the institutional level, and in the underwriting of securities. Moon had known Beutel for about 30 years. South East had purchased municipal bonds through Shearson, and Moon had handled the transactions. Brown was an old friend of Moon, and knowing that Shearson had personnel who were knowledgable in the insurance company field, arranged with Moon to set up a meeting with Beutel. The meeting was attended by Beutel, Brown, Kutak, Moon, and Sjostrom. Sjostrom was an insurance stock analyst. Beutel described Guarantee and its principals; figures were produced; and the underwriting of the stock was discussed. At that meeting it came out that there *123 was some transaction by Guarantee with respect to Las Vegas property that should not have been made, relating to the size of a loan in comparison with the total assets of Guarantee. Beutel had a number of discussions with representatives of Shearson during the rest of 1957. He advised them of the 4,167 shares that he owned, of the option that he had on the 33,333 shares, and that he was seeking an underwriting of the stock for the purpose of a public offering. He displayed Guarantee statements to them. There were several meetings, both in and out of the Shearson, Hammill offices, and telephone calls. Between June 6, 1957, and the end of 1957, Beutel and Kutak talked to a few friends about the availability for purchase of some Guarantee stock, but these persons, Brown, Meitus, Segal, and Anderson did not give any written commitment to purchase a specific number of shares at a stated price. Beutel did not offer any of his 4,167 shares to Segal or Meitus, but he asked them if they would participate in a purchase if there was an underwriting of the 37,500 or 33,333 shares. Kutak did not contact individuals to lay off or to sell any part of the 4,167 shares that he might possibly be committed *124 to purchase under his agreement. Neither Brown nor Segal, nor anyone gave Kutak an oral or written commitment to buy any shares, up to January 1958. Kutak did not believe that he could raise money to buy the 4,167 shares (from Beutel), himself. When Beutel told Kutak (end of 1957) that his efforts to get an underwriting were unsuccessful, Kutak did not take any steps to get agreements from individuals to purchase the 4,167 shares from either Beutel or himself. The talks of Beutel and Kutak with representatives of Drexel Co., and Shearson, Hammill & Co. were no more than preliminary conversations about the general proposition of underwriting about 75 percent of the Guarantee stock for a public offering. From 4 to 5 months are required to effect an underwriting for a public offering of stock. An underwriter must make a full and careful investigation of the management and policies of the corporation involved, and of the standing and activities of its principal stockholders. In the talk or talks in 1957 with representatives of Shearson, Hammill & Co., there was not any agreement about the total quantity or number of shares of Guarantee to be underwritten for a public offering, or of *125 the price per share to be paid to the underwriters or of the price per share at which the shares would be offered to the public, or of the evaluation to be made of Guarantee, the corporation. During these discussions, the matter was not discussed of obtaining certified statements of the assets, liabilities, and operations of Guarantee by outside accountants, all of which are necessary elements in firm preparations for an underwriting. The following are necessary steps in a firm preparation for the underwriting of stock of an insurance company, for a public offering of the shares, but during the inquiries by Beutel in 1957, these steps were not taken by Shearson, Hammill or Drexel Co. (with which there was only one talk): (a) A study is made of the growth of the net worth and earnings of the subject corporation, and then close comparisons are made with the same data of similar corporations. (b) An analysis is made of the general level of the stock market so as to arrive at an evaluation of the stock to be underwritten, as everything is relative to the stock market. (c) A trade check is made of the persons who control and manage the the corporation under consideration. (d) A registration *126 is made with the Securities and Exchange Commission. These steps take 4 or 5 months. The following is a schedule of cash dividends declared and paid by Guarantee to its stockholders for the period January 1, 1953, to January 3, 1964, inclusive: Per
Total
Share
Amount of
Declaration
Dates of
Year
Amount
Dividend
Date
Checks
1953
$ .50
$ 25,000.00
10-15-53
11-24-53
1954
1.00
50,000.00
7-15-54
8- 1-54
1955
1.00
50,000.00
4-15-55
6- 7-55
1956
None
1957
2.00
100,000.00
1- 3-57
1- 2-57
1958
2.00
91,666.00
1-15-58
1-31-58
.50
22,916.50
10-15-58
11- 5-58
1.50
68,749.50
10-15-58
12-24-58
1959
2.00
91,666.00
1-15-59
1- 9-59
2.00
91,666.00
6-24-59
6-23-59
1960
1.00
45,833.00
11-11-60
1-11-61
1961
5.00
229,165.00
12-18-61
12-18-61
1962
2.00
91,666.00
4- 9-62
4- 9-62
1963
3.00
137,499.00
1- 3-63
1- 3-63
1964
3.00
137,499.00
1- 3-64
1- 3-64
The earned surplus of Guarantee on December 31 of 1957 and 1958 amounted to $5,960,309.46, and $5,174,901.58, respectively. Guarantee collected over $1,000,000 interest on its loans to Bond Estate, Inc.; and it did not suffer any monetary *127 loss from any of its loans to any enterprise related to Jaffe. Guarantee's cash, bonds, and stock (part of assets) at December 31 of 1956, 1957, and 1958, in even figures were: 1956
1957
1958
Cash
$1,287.287
$1,903,000
$2,339,396
Bonds
1,686,025
3,391,927
1,757,932
Stocks
53,900
74,400
736,825
$3,023,213
$5,369,327
$4,834,153
The efforts to work out the underwriting encountered difficulties due to a number of factors. The market conditions were not goods in the fall of 1957, and the underwriters were not enthusiastic. In the view of one qualified expert, 1957 was a very bad time to underwrite this stock. The following is a table showing the average number of times earnings at which the Dow Jones industrial stocks were selling on the market for the periods indicated: 1956
1957
1958
First quarter
14.2
13.8
13.7
Second quarter
13.9
14.4
16.3
Third quarter
14.1
12.4
19.0
Fourth quarter
15.0
12.1
20.9 During the last half of 1957, outstanding stocks could be purchased cheaply in the market and there was little demand for new stocks. This was also true in the period just prior to the 1958 recession, *128 which influenced the market. Even with a more optimistic outlook, the market at that time in 1957 was in a "static state," and although there were a diversity of filings of securities at that time, it was the kind of market in which the price that an underwriter might be able to secure might not be satisfactory to an issuing company or to selling stockholders. Sjostrom's opinion was that in 1957 the market was "not good." The adverse publicity that Guarantee had received also affected the underwriters' reaction. Beutel tried to offset that adverse effect by pointing out that there would be a new management and a new board of directors. In addition, the financial picture of Guarantee was not entirely satisfactory. Although the earnings were up, and 1956 was a year of good earnings, there previously had been a shrinkage of its surplus due to the acquisition of another company by Guarantee. It also developed that there was not sufficient time to work out all of the material that would be required, and to determine the best price that the market could digest in light of the circumstances. When asked how long it would take to evaluate the Guarantee stock in order to determine the price *129 at which it could be underwritten, Sjostrom's view was that he could not estimate the time because Guarantee was a very difficult company to evaluate, because although its earnings were excellent, those earnings were coming from a mail-order accident and health business, and there was no other company comparable to it. An investment analysis of the required kind would involve a comparative analysis, but there was no comparable company. During the latter part of December 1957, Beutel concluded that the possibility of a successful underwriting at that time was minimal or remote. The Sale of Beutel's Stock Beutel made no effort to ask for an extension of his loan from City National because the underwriting matter was not moving fast enough and did not appear to be a possibility early in 1958. Early in January 1958, Beutel called Kutak, told him that he had been unsuccessful in distributing the stock, and said that he was prepared to exercise his rights under the agreement by asking that Guarantee buy his stock. Kutak told Beutel that he would take up the matter with Guarantee's board of directors. Kutak spoke to each of the directors and was given their authority to purchase *130 the stock from Beutel. Later at a special meeting of the board of directors of Guarantee on June 24, 1959, the following action of ratification was taken, as shown in the minutes of that meeting: The Chairman then noted it had been called to his attention that authorization of the purchase, at $330 a share, by the Company, of 4,167 shares issued to Clarence A. Beutel had not been recorded. A resolution was thereupon adopted ratifying this action. Kutak regards the foregoing not so much ratification by the board of the purchase of the 4,167 shares, as a correction or "memorializing" of minutes of a directors' meeting held on January 15, 1958, which was the time when the members of the board of directors authorized and approved the purchase of the shares from Beutel. On January 15, 1958, Guarantee issued its check to Beutel in the amount of $1,375,110 in payment for the 4,167 shares of Guarantee stock at $330 per share. This check was deposited with City National for the credit of South East and for the account of Beutel. On January 15, 1958, Beutel issued his check drawn on his account at South East, payable to City National, in the amount of $1,288,356.16, in repayment of the *131 loan of City National to him in June 1957, plus interest. Of that amount $1,250,000 was the repayment of Beutel's note dated June 5, 1957, and $38,356.16 was in payment of the interest due on the note from the date of the note to January 15, 1958. The collateral for the loan to Beutel, consisting of Beutel's 4,167 shares of Guarantee stock, the Kutak family's 12,500 shares of Guarantee stock, Beutel's 2,000 shares of South East stock, the Trustees' Certification and Copy of Trust Agreement, and the Direction to Trustees signed by Kutak, all were returned by City National on January 15, 1958. Beutel then delivered his Certificate, No. 72, evidencing 4,167 shares of Guarantee stock to Guarantee. Guarantee canceled that certificate. City National's duplicate copy ("Permanent Record") of the Temporary Safekeeping Receipt bears the following in the margin: To: City National Bank and Trust Company of Chicago You are authorized to deliver all securities and papers covered by this receipt to Mr. Ben Jaffe against his receipt. Received of City National Bank and Trust Company of Chicago the securities or property described in this duplicate of receipt issued to undersigned and bearing *132 same date and number. Date 1/16/58 /signed/ C. A. Beutel Received securities and papers covered by this receipt. /signed/ Ben Jaffe Beutel reported the transaction on his 1958 income tax return as follows: He reported the difference between the price for which he sold the stock, $1,375,110, and the price which he paid for it, $1,250,100, or $125,010, as a long-term capital gain, on which he paid the tax due. Also, he claimed a deduction for the interest that he paid on the City National loan, in the amount of $38,356.16. Beutel did not turn over any part of the gain of $125,010 to anyone, nor did anyone ever reimburse him for all or any part of the interest that he paid to City National. He used the net proceeds, $125,010, for his own purposes. He went on a trip around the world, paid a few loans, and acquired additional stock in South East, or in the Colonial Bank. On January 15, 1958, Guarantee charged its Treasury Stock account with $1,375,110, and credited its Disbursements-South East National Bank account with the item to Clarence Beutel of $1,375,110. Subsequently, the Indiana Insurance Department advised Guarantee that it was not proper under Indiana law for Guarantee *133 to hold those shares as treasury stock, and that the shares should be canceled, and the capitalization of Guarantee should be correspondingly reduced. This was done. On August 14, 1959, at a special meeting of the board of directors of Guarantee, a resolution was adopted to amend the articles of incorporation of Guarantee to reduce the capital stock of Guarantee from $500,000, consisting of 50,000 shares of the par value of $10 per share, to $458,330, consisting of 45,833 shares of the par value of $10 per share, the reduction being of the 4,167 shares. On August 14, 1959, at a special meeting of the shareholders of Guarantee, the same resolution was adopted as the one adopted at the meeting of the directors. A part of those minutes was a sheet, signed by all of the shareholders of the 45,833 shares, which reads as follows: We, the undersigned, being all shareholders, individually or as trustee, of the Guarantee Reserve Life Insurance Company of Hammond, Hammond, Indiana, hereby acquiesce to the transaction on January 15, 1958 whereby the total number of shares outstanding of Guarantee Reserve Life Insurance Company of Hammond was reduced to 45,833, by the payment of $330 per share *134 to the owner of 4,167 shares of stock, represented by certificate No. 72 and paid for by check No. 00055 for $1,375,110.00. On February 2, 1960, the Secretary of State of Indiana approved the amendment of the articles of incorporation of Guarantee effecting the reduction of its capital stock. A letter dated January 20, 1960, was sent by James C. Jay, Special Counsel, Department of Insurance, to Edwin K. Steers, Attorney General of Indiana, which reads as follows: Re: Guarantee Reserve Life Insurance Company of Hammond: Dear Sir: I have examined the Articles of Amendment of the Articles of Incorporation of the Guarantee Life Insurance Company of Hammond and find that they have been executed in accordance with the Acts of 1935, Chapter 162, which amendment was executed August 14, 1959 by J. F. Kutak as President and R. M. Seidel as Secretary but was acknowledged in Marion County on January 19, 1960. Said amendment of Article 6 of the Articles of Incorporation of said company reduces the amount of authorized capital stock from $500,000 to $458,330 and also reduces the number of shares from 50,000 having a par value of $10.00 each to 45,833 shares having a par value of $10.00 each. *135 I, therefore, recommend your approval as to legality of form. A letter dated January 26, 1960, was sent by the same Special Counsel to the Attorney General, which reads as follows: Re: Guarantee Reserve Life Insurance Company of Hammond: Dear Sir: I am herewith handing you certificate of the Department of Insurance under date of January 26, 1960 in reference to the above captioned matter. This certificate should be attached and associated with my letter to you of January 20, 1960 in which I approved the amendment to the Articles of Incorporation of the above named company as to legality of form. On the basis of this certificate, I am of the opinion that the amendment of Article 6 of the Articles of Incorporation of said Guarantee Reserve Life Insurance Company of Hammond is in conformity with Section 39-3813, Burns Indiana Statutes, being Section 113, Chapter 162 of the Acts of 1935. I, therefore, recommend your approval of said amendment. The above two letters were sent to Guarantee by the attorney for the Insurance Department. Under date of December 31, 1959, the following entry was made in Guarantee's journal: Capital Stock
$ 41,670.00
Redemption of Stock (1958 excess of par value)
1,333,440.00
Company Stock Owned
$1,375.110.00
To remove Asset and reduce Capital Stock in con-
formity with examiner's report.
*136 Beutel did not make any efforts to control any of the operations of Guarantee during the period June 5, 1957, to January 15, 1958. He did not have anything in writing regarding what Guarantee could do, or could not do, during the period of his option to acquire 33,333 shares of Guarantee stock from the Jaffe family, such as whether Guarantee could or could not sell a major portion of its assets during the option period; or what amount of dividends Guarantee could pay, or the amount of executives' salaries it could pay during that period. Although the Jaffes, under their Memorandum Agreement dated June 4, 1957, the proxy agreement, gave Beutel proxies to vote the 33,333 shares of their stock (held in the voting trust), the proxies could not be used and acted under by Beutel until after January 15, 1958, and only under certain conditions, then. On March 11, 1960, Jaffe was indicted for evasion of 1953 income taxes, in the alleged amount of about $157,000; and on March 28, 1961, he was indicted with respect to 1954 and 1955 income taxes, the amount involved being about $15,000 for 1954, and about $128,000 for 1955. Jaffe pleaded "guilty" for 1953 and 1954, and "not guilty" for 1955; *137 and was found guilty for 1953 and 1954. The indictment for 1955 was dismissed. On October 11, 1961, petitioner was sentenced, with respect to 1953 and 1954, to a fine of $10,000 and 1 year imprisonment for each of those years, with the sentences to run concurrently. The sentence was suspended; he was placed on 2-years' probation. Part of the deficiency for 1957 resulted from several adjustments which no longer are in issue, having been settled under stipulations, explained below, leaving in issue only respondent's adjustments relating to the purported sale in 1957 by Jaffe to Beutel of 4,167 shares of stock of Guarantee. Respondent adjusted this item in the 1957 return by including $1,250,100 in taxable income, as ordinary income, and by eliminating the long-term capital gain attributed to the transaction ($1,237,557.33), of which 50 percent, or $618,778.66, was reported on the 1957 return. The parties, by their stipulations, have made concessions, respectively, for 1957, which may be summarized as follows: Respondent concedes that the petitioners did not realize additional income in the total amount of $44,610.94 made up of the following: Not Taxable Income
$ 19,271.63
275.00
18,524.17
500.00 6,040.14
$ 44,610.94 *138 Respondent also concedes that petitioners did not realize gain from sales of shares of stock and debentures of Flamingo Hotel, Inc., in the amount of $585,000, but instead sustained long-term capital losses in 1957 in the respective amounts of $1,250 (item e) and $3,216.25 (Flamingo Hotel item). Petitioners concede that respondent properly added to taxable income a total sum of $17,465.50, as follows: Taxable Income
$ 475.00
1,000.00
7,258.00
1.050.00
1,250.00
6,432.50
$ 17,465.50 These mutual concessions relating to additional allowable deductions, $44,610.94, and additional income, $17,465.50, represent a net decrease in taxable income of $27,145.44. However, another determination, not contested, of a disallowance of a deduction of $19,574.17, when off-set against $27,145.44 reduces the latter figure to $7,571.27, which is the net reduction in taxable income involved in all of the 1957 determinations other than the respondent's addition of $1,250,100 to taxable income, which is in issue and is in lieu of the 50 percent of long-term capital gain included in income on the return in the amount of $618,778.66 (sale of shares of Guarantee stock). For 1957, the *139 respondent imposed a negligence penalty under section 6653(a) of $50,010.16. It is stipulated, and petitioners agree, that if it is held that there was an underpayment of the 1957 tax, a negligence penalty, or addition to the tax, under section 6653(a) shall be imposed. For 1958, part of the deficiency resulted from several adjustments which no longer are in issue, having been settled, as explained below. Part of the deficiency (the major part) resulted from respondent's making a determination which is an alternative to the major determination causing the larger part of the deficiency for 1957. Also, for 1958, the respondent determined a 5 percent negligence penalty under section 6653(a). The respondent has stipulated that the petitioners are not subject to a negligence penalty for 1958 in the amount of $64,671.08 (as determined), or in any other amount. The minor determinations of the respondent which have been settled are as follows: Petitioners agree that there is additional income in the amount of $27,625, as determined by respondent. Respondent concedes that petitioners are entitled to deductions totaling $19,032.55 ($15,135.13; $2,185; $1,437.42; $275). These stipulations *140 result in adjustments increasing taxable income for 1958 in the net amount of $8,592.45. In addition, the parties have agreed that the petitioners sustained a long-term capital loss of $13,812.50. For 1958, the major determinations of the respondent comprised an addition to taxable income in the total amount of $1,459,593.61, made up of 4 adjustments, as follows: 1.
$ 18,786.76
2.
15,696.85
3.
50,000.00
4.
1,375.100.00
$1,459,593.61
Of the above total determination, there remains in issue (as an alternative to a 1957 determination) the addition to taxable income of $1,375.110. The parties are agreed, with respect to items 1, 2, and 3, above, that $67,021.43 constitutes taxable income ($50,000, plus $17,021.43); but that $17,462.18 is not taxable income ($1,765.33, plus $15,696.85). Therefore, under these stipulations the parties are agreed that there is a net amount of taxable income, involved in these adjustments, of $49,559.25. Ultimate Findings Jaffe received a constructive dividend from Guarantee in 1958 in the amount of $1,375,110. In substance, Jaffe gave Beutel an actual, although unwritten, promise in June 1957, as a condition to Beutel's *141 taking over 4,167 shares of Guarantee stock from Jaffe on June 5, 1957, that Beutel would realize ultimately $330 per share, $1,375,110, and would not sustain any loss. The payment by Guarantee on January 15, 1958, to Beutel of the above sum satisfied a personal obligation of Jaffe to Beutel; and, also, Guarantee's redemption of the 4,167 shares was in substance a redemption thereof from and to Jaffe, although it was in form from and to Beutel. The redemption, in substance from Jaffe was essentially equivalent to a dividend to Jaffe. There was no real and bona fide substance to Beutel's and Kutak's efforts in 1957 to obtain an underwriting of a public offering and sale of 37,500, or 33,333, or any lesser number, of shares of Guarantee stock, or to sell 4,167 shares. Kutak was not financially able to purchase, himself, 4,167 shares at the agreed price of $330 per share. Opinion The respondent's contentions are as follows: He contends that the acquisition by Beutel in 1957 of 4,167 shares of Guarantee stock from Jaffe, and Beutel's attempted underwriting for a public offering of about 37,500 shares of stock of Guarantee were, in fact, a sham. Therefore, the intermediate steps of *142 the transaction involving Beutel should be disregarded for tax purposes; and the redemption in 1958 by Guarantee of 4,167 shares should be treated as having been made from Jaffe and not from Beutel. He contends that there were patent and apparent prearrangements of the entire transaction and a need for the use of the corporate funds of Guarantee to extinguish the bank loan used to provide Jaffe with $1,250,100 in 1957. Therefore, Jaffe should be considered to have received constructively dividend income in the amount of $1,250,100 in 1957, and $125,010 in 1958, the total of both being $1,375,110. Respondent contends alternatively that Jaffe constructively received dividend income in 1958, at the time of the actual redemption, in the amount of $1,375,110. Another alternative contention of the respondent is the following: Assuming arguendo, but not conceding, that the purchase by Beutel of 4,167 shares of Guarantee stock, and his attempted underwriting for public offering of 75 percent of the shares of stock of Guarantee, were, in fact, bona fide rather than a sham, the transaction resulted, as a matter of law, in Jaffe's constructively receiving in 1958 dividend income in the amount *143 of $1,375,110. The respondent's arguments in support of this contention and other contentions are stated hereinafter. Petitioners contend that the transaction between Jaffe and Beutel was one of economic substance and reality, was bona fide and not a sham, and that Jaffe and Beutel were motivated solely by their respective and different business purposes. Petitioners argue that Jaffe had no desire to sell all of the Jaffe stock, but was put under the pressure of Beutel, who insisted on an all-or-nothing deal as a condition to his first buying 4,167 shares of Guarantee stock from Jaffe; and that only for compelling commercial reasons did Jaffe undertake to sell the shares which Beutel acquired, namely, his lack of any other saleable asset and his urgent need to discharge his large indebtedness which was to become due and payable in one month. Petitioners contend that the agreed sales price of $300 per share was based upon a commonly used formula for determining a fair and reasonable price for insurance company stocks; and that the price of $300 per share was arrived at independently by each of the individuals concerned, namely, Jaffe, Beutel, and Kutak. Petitioners argue, further, *144 that in June 1957 Kutak and Beutel had real reasons for wanting to "freeze out" the Jaffes and get them out of Guarantee. Petitioners contend that the reality of Kutak's desire to oust the Jaffes from Guarantee was evidenced by his willingness to assume "enormous personal economic risks" in order to assist Beutel in securing a hold on the stock of Guarantee held by the Jaffe family. It is also claimed that Beutel and Kutak worked with bona fide and real diligence in attempting to do two things to enable Beutel to exercise the option by January 15, 1958, or to provide a basis for his obtaining an extension of the option period, namely, that they tried to get a group of their business associates to agree to purchase a sufficient number of shares of Guarantee stock to give them control of Guarantee, and that they made real efforts to get a stock broker or dealer to agree to underwrite a public offering (sale to the public) of a substantial block of the option stock. Petitioners strongly argue that Jaffe, individually, and the members of the Jaffe family, entered into legally binding transactions and agreements with Beutel which must be recognized for tax purposes. Petitioners make *145 an alternative contention, as follows: That if, for the sake of argument only, and without making any concession, the transaction involving Jaffe's 4,167 shares was "in some imputed or constructive sense" tantamount to a redemption by Guarantee of those shares of stock, such "constructive" redemption was not essentially equivalent to a dividend and therefore was not taxable to petitioner as a dividend; but if, arguendo, the transaction resulted in a constructive dividend to Jaffe, the year in which the incidence of tax fell was 1958 and not 1957. Petitioners claim that the evidence supports their contentions; that they sustained their burden of proof; and that the respondent failed to introduce evidence, or elicit proof, through cross-examination of petitioners' witnesses, which contradicts and refutes the evidence which they assert supports their several and various contentions. Among the cases cited by the petitioners as authorities which support their claims are the following: ; ; ; , *146 reversing ; ; ; and , reversed . Petitioners have cited additional authorities. All have been considered. There is no dispute between the parties about the facts involved in the several formal steps which were taken, or about the general background facts. The controversy involves the significance which properly can be given to the formal steps. The basic issue is one of substance versus form. Respondent contends that much of the testimony of certain witnesses of the petitioners is unworthy of belief. The general issue presents questions of fact. The Findings of Fact are long because it is necessary to set forth all of the formal steps taken, the background facts, and the procedures on which the petitioner, Jaffe, relies. But the essential facts are relatively simple. It is helpful to bring them together so as to put in perspective what constitutes the respective contentions of each party. The stock of Guarantee was closely held; 75 percent by Jaffe (individually) and his family (a large part in a voting *147 trust), and 25 percent by Kutak (holding 100 shares in his name) and his family (holding 12,500 shares in a voting trust). Originally, the issued stock was 10,000 shares, of which Kutak subscribed to 2,500 shares in 1945, at the price of $37,500. Kutak borrowed $37,500 from Jaffe at 5 percent interest in 1945, to purchase the shares. Guarantee's issued stock later was increased, by declarations of stock dividends, to 50,000 shares, which increased the Kutak shares to 12,500, and the Jaffe shares to 37,500. Kutak did not make any payments to Jaffe on the principal of his note until November 1961; in December 1959, Kutak paid Jaffe accumulated interest on the loan in the amount of $26,378.48. In November 1961, Kutak paid Jaffe $35,000 on principal, and $3,500 interest on the note, and there now is a balance due Jaffe of $2,500 on the principal amount of the loan. Jaffe had controlled Guarantee, as a stockholder, director, and president since 1945, at least, if not since 1933, until he resigned both offices on August 10, 1956. It is recognized that his resignations from these offices were actual but it would be unrealistic not to recognize that throughout 1957 and 1958 Jaffe and his *148 family owned the controlling shares of Guarantee stock, albeit their block of stock was under an option held by Beutel. There is no convincing evidence that Jaffe and his family did not, as the record owners of a majority of the shares, continue to have the power to exercise the majority interest in Guarantee. In addition, Guarantee's financial condition in 1956, 1957, and 1958 was good. Its earned surplus at the end of those years, in round figures, was $5,436,000, 1956; $5,960,300, 1957; and $5,174,900, 1958. Its cash, bonds, and stock at the end of each of those years amounted to (round figures) $3,000,000, 1956; $5,300,000, 1957; and $4,800,000, 1958. Beutel did not have the cash to pay, and his net worth was not enough to support a loan of $1,250,000, to enable him to buy 4,167 shares of Jaffe's Guarantee stock. City National Bank (sharing the Jaffe loan with Beutel's South East bank) held Jaffe's note for the balance of $580,000, and that latest note was due May 31, 1957. City National held as collateral for the Jaffe note all of the shares of stock of Guarantee, both the Jaffe and Kutak shares, including the 4,167 shares to be sold to Jaffe. The loan officers of City National *149 were well acquainted with the financial condition of Guarantee, as well as with Beutel, and knew of the size of Guarantee's unassigned earned surplus which belonged to its shareholders. When, on June 5, 1957, City National made a loan to Beutel of $1,250,000, the pledged collateral held by City National consisted of the 4,167 shares of Gaurantee acquired by Beutel; Kutak's 12,500 shares of Guarantee, Beutel's 2,000 shares of South East stock, and Kutak's personal guarantee of the loan; i.e., 16,667 shares of Guarantee stock rather than the entire 50,000 shares which had been pledged to secure Jaffe's loan. The stock of Guarantee was not a listed stock and it was not traded over the counter. The 4,167 shares acquired by Beutel represented a minority interest of less than 10 percent (out of 50,000 shares). The price of $300 per share to Jaffe for the 4,167 shares did not reflect any adjustment in price for a minority interest, but was a price computed on the basis of 50,000 shares under the formula used by Kutak, and the price of $330 per share, which Beutel wanted to obtain did not reflect any adjustment for the minority interest represented by roughly 4,000 shares. Although Guarantee's *150 financial position in 1957, on its books, was good, Guarantee was operating under a cloud. The Indiana Insurance Commission was severely critical in 1956 and 1957 of some of Guarantee's large loans, and Guarantee received, in 1956 and 1957, unfavorable newspaper publicity. The critical aspect of the transaction with Beutel consists of the arrangements made at the time of the sale of the 4,167 shares to him. All of those arrangements must be and have been closely scrutinized. Respondent's contentions with respect to this phase of the arrangements with Beutel are as follows: If it is assumed, arguendo, without deciding the question, that Beutel's purchase of the 4,167 shares was actual, bona fide, and not a sham, and that Beutel's discussions with others about an underwriting and public offering of 75 percent of the stock of Guarantee were bona fide and were not a sham, there remains the question whether the eventual redemption of the 4,167 shares by Guarantee and its payment of $1,375,110 to Beutel on January 15, 1958, was in fact and reality a payment by the corporation of a personal obligation of Jaffe to Beutel, namely to have $330 per share, or $1,375,110, paid to Beutel, so *151 that Beutel would recover funds, repay the loan of City National, and realize a profit out of the transaction. Respondent contends that in substance Jaffe made that commitment to Beutel, however carefully such personal obligation of Jaffe was concealed by the form of the arrangements, and that since Guarantee paid the above amount to Beutel through its redemption of the 4,167 shares in 1958, Jaffe as a matter of law constructively received a dividend in the above amount. It is necessary to turn to an examination of the agreements received by Beutel at the time and as a condition of his acquiring the shares in question: On June 5, 1957, Jaffe and the members of his family, and the voting trustees executed an agreement with Beutel (sometimes called the proxy agreement), in which it is recited that Beutel was purchasing the 4,167 shares of Guarantee stock, and was receiving an option to buy 33,333 shares of the Jaffe family's stock. This agreement also recites various restrictions on Beutel, including this; that Beutel would not sell the 4,167 shares, except that he could sell all or part of them to not more than 4 of his associates upon receiving and giving to Ben Jaffe an "investment *152 letter". With respect to the proxies to vote the 33,333 shares (after January 15, 1958), in paragraph 1(b) it is provided that (b) Said proxies shall be void and of no effect (1) unless subsequent to January 1, 1958, and prior to January 10, 1958, Beutel shall have offered to sell the aforesaid 4,167 shares of stock of the Company at a price of not to exceed $1,375,110, and said stock shall not be purchased by the Company by the close of business on January 15, 1958, or (2) in the event that Beutel shall at any time sell, transfer or dispose of all or substantially all of said stock to some purchaser other than the Company; In the above clause, it is clear and obvious that the parties, including Ben Jaffe, understood and agreed that Beutel might and could, between January 1 and 10, 1958, offer to sell the 4,167 shares to Guarantee for not more than $330 per share, or $1,375,110, and that Guarantee might purchase those shares by January 15, 1958. On June 4, 1957, Kutak and Beutel executed an agreement whereby Kutak agreed to buy the 4,167 shares for $330 per share, if Beutel had not sold them by January 16, 1958; and Kutak, also, agreed to save and hold Beutel harmless "from any *153 loss through any cause connected with the purchase of said stock from said Jaffe and the making of the loan aforesaid [to Beutel, $1,250,000] with the said City National Bank & Trust Company." However, Kutak did not have $1,375,110, or assets to support a loan of that amount to himself, Kutak. It is true that Jaffe did not undertake in any written document to agree to cause Guarantee to purchase the 4,167 shares from Beutel, in the future, or to pay Beutel $1,375,110, but the question is whether in substance that is what Jaffe really did; or, stated differently, was there an understanding between Jaffe and Beutel that Jaffe would save Beutel from any loss in connection with Beutel's purchase from Jaffe of the shares in question, and also assured Beutel that he not only would not sustain any loss but also would realize a profit of $30 per share by realizing $330 per share, or $1,375,110 when Beutel disposed of the 4,167 shares. Another question is whether in substance Kutak's assurance to the above effect was in substance the assurance of Jaffe? We turn now to the conclusion we must reach here on the basis of the entire record, the reasonable construction of the evidence, the *154 weighing of all of the evidence, the testimony and the substance of that was done. Petitioners had the burden of proof, and of overcoming the prima facie correctness of the respondent's determination. Did petitioners discharge their burden of proof? Our conclusion is that petitioners failed to discharge their burden of proof. Analysis and consideration of the record as a whole leads to the conclusion that the acquisition by Beutel of 4,167 shares of stock of Guarantee was done with the understanding that those shares would, in fact, be redeemed by Guarantee in 7 1/2 months, so that the loan at City National could be repaid. Also, that the acquisition of those shares by Beutel was solely for the purpose of causing a planned redemption of those shares to appear to be a redemption from Beutel when, in fact, the redemption was from Jaffe; and that the sale of the 4,167 shares of Guarantee stock to Beutel, and his sale of them to Guarantee, were merely steps in an integrated transaction taken solely for the purpose of altering the tax liabilities that would have resulted from a direct sale of the 4,167 shares to Guarantee by Jaffe. In other words, Jaffe attempted to do indirectly, by *155 means of the several formal steps involved, what he could not do directly without the recognition of the receipt of dividend income. It is axiomatic that the incidence of taxation depends upon the substance of a transaction. The tax consequences of a transaction are not finally determined solely by the form employed. Rather, the transaction must be viewed as a whole, and each step is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another merely by using the latter as a conduit. To permit the true nature of a transaction to be disguised by mere formalism, which exists solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of . The taxing statutes are intended to take cognizance of realities and not mere appearances or facades. . The evidence about the alleged efforts of Beutel and Kutak to obtain an underwriting of the 33,333 option shares of Guarantee is far from convincing. Rather, the plain inference to be drawn from the weak evidence about those alleged efforts is that Beutel's *156 and Kutak's participations therein, and in the whole arrangement, were not for any bona fide purpose. Without an underwriting, the destiny of the 4,167 shares held by Beutel was clear, namely, redemption by Guarantee. Neither Beutel nor Kutak was financially able to purchase the 4,167 shares for his own account. Moreover, these minority shares were not (according to Beutel and Kutak) even worth $300 a share. Even if a serious effort had been made to obtain an underwriting of the 33,333 option shares (which was not done) there is substantial doubt, upon the record here, that an underwriting of the option shares could have been obtained. Guarantee was under a cloud at the time (as Jaffee has acknowledged). Since the purported plan of obtaining an underwriting of the option shares could not have been earnestly attempted or seriously contemplated the ultimate redemption by Guarantee of the 4,167 shares (in form from Beutel) was clearly the eventuality contemplated at the beginning of the formal steps and arrangement. The evidence establishes without doubt that Beutel exacted as a condition precedent to his buying the shares from Jaffe that he, Beutel, receive the commitment that he *157 would be able to dispose of all of them for $330 per share, and would not suffer any loss. The redemption, in form, was from Beutel, but in substance the redemption was from Jaffe. A sale by one person cannot be transformed for tax purposes into a sale by another, merely by using the latter as a conduit. Court The question of whether a redemption is essentially equivalent to a dividend depends upon the facts and circumstances of each case. , aff'd. ; , affd. . No one factor is controlling, and all of the relevant factors must be considered. , affd. . Furthermore, it is now generally accepted that the question of whether the distribution was "essentially equivalent" to the distribution of a taxable dividend is to be resolved by determining whether the distribution had the "net effect" of the payment of a taxable dividend. ; $ . Cases on this point have *158 failed to lay down a sole decisive test. But, they have established certain judicial criteria or guide posts which have proven useful in determining whether the distribution had the "net effect" of the payment of a taxable dividend. Some of the more important criteria are as follows: 1. The presence or absence of a bona fide corporate business purpose for the redemption. 2. Whether the action was initiated by the corporation or by the stockholder. 3. The amount of earnings and profits available for the declaration of a regular dividend. 4. Whether the distribution resulted in any substantial change in ownership and control or in a contraction of the corporate operation. 5. The effect of the distribution as compared with the declaration of a regular dividend. 6. A generous supply of cash. 7. Whether there appeared to be a plan or scheme of tax evasion. , affd. ; , affd. ; . When the various criteria considered by the courts in determining whether or not a redemption is essentially *159 equivalent to a dividend are examined, we find in this case that there were: 1. The lack of a bona fide corporate business purpose for the redemption; 2. The redemption was initiated at the stockholder level rather than at the corporate level; 3. The presence of substantial earnings and profits available for a regular dividend; and 4. The presence of what fairly appears to be a plan or scheme of tax evasion. There was no business purpose for Guarantee's redeeming the shares; there was no reduction in its business, for example. In substance, Guarantee paid a personal obligation of Jaffe, to Beutel. Our conclusion is that in substance Guarantee satisfied a personal obligation of Jaffe to see to it that Beutel realized and received $1,375,110 for the 4,167 shares, when in 1958 Guarantee redeemed those shares and paid that sum to Beutel, and we have so found. It follows that in 1958, Jaffe constructively received a dividend of Guarantee in the above amount. We sustain respondent's determination in respect of the taxable year 1958, and do not sustain his alternative determination in respect of 1957. Decision will be entered under Rule 50.